[No. F018122. Fifth Dist. Oct. 18, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
LUIS ALBERTO LOMELI, JR., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, II, IV, V and VI.

## COUNSEL

Jeff Reich, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and Karen L. Ziskind, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MARTIN, J.—

### STATEMENT OF THE CASE

On February 21, 1992, the Kern County District Attorney filed a five-count information against Luis Alberto Lomeli, Jr. (defendant), charging him in count 1 with oral copulation (Pen. Code, § 288a, subd. (c)),[1] in count 2 with touching an intimate part of the victim (§ 243.4, subd. (a)), in count 3 with assault with intent to accomplish an act of sexual intercourse

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

(§ 220 and former § 261, subd. (2)), a serious felony within the meaning of section 1192.7, subdivision (c)(10), in count 4 with false imprisonment (§ 236), and in count 5 with burglary (former § 460, subd. 1), a serious felony within the meaning of section 1192.7, subdivision (c)(18), and further alleging that defendant was ineligible for probation (§ 462, subd. (a)). It was further alleged under counts 1 through 4 that defendant suffered a prior conviction within the meaning of section 667.5, subdivision (e).

On April 21, 1992, the process of selecting jurors commenced. Prospective jurors were sworn and received a questionnaire.

The People's motion *in limine* to exclude evidence of the victim's prior juvenile misdemeanor adjudication was granted. However, the prosecution was permitted to impeach defendant with his prior misdemeanor convictions should he elect to testify.

The next day, defendant's motion for a new panel on the basis that this panel was tainted by the statement of a prospective juror was granted. A new panel of prospective jurors was assembled, each member was handed the questionnaire and sworn.

The court thereafter examined prospective jurors who overheard a conversation in the jury assembly room about the previous panel and statements they made. Defense counsel then moved for a new panel, but that motion was denied.

On April 23, 1992, after the prosecution dismissed two Hispanic jurors, defense counsel made a *Wheeler* motion. The court found that no prima facie showing had been made and denied the motion. The jury and one alternate juror were then sworn.

On April 28, 1992, the jury returned its verdict finding defendant guilty as charged on counts 1, 2 and 4, not guilty on count 5, and the court declared a mistrial on count 3. Defendant waived a jury trial on the felony prior and the court found the allegation to be true. At a later date, the district attorney's motion to dismiss count 3 in the furtherance of justice was granted.

At the sentencing hearing, the court denied probation and sentenced defendant on count 1 to the upper term of eight years, plus one year for the prior conviction; on count 2 to the upper term of four years; and on count 4 to the upper term of three years, sentence on both counts to be stayed upon successful completion of count 1 and permanently stayed thereafter. The court also ordered defendant to register as a sex offender (§ 290), to pay restitution (Gov. Code, § 13967), to submit to a blood test (§ 1202.1) and

awarded him 194 days of presentence custodial and behavioral credit. Defendant filed a timely notice of appeal.

## FACTS

Sixteen-year-old Natalie P. lived with her mother and two younger brothers, Johnny and Anthony, in a two-bedroom apartment in Bakersfield. On January 26, 1992, Super Bowl Sunday, Mrs. P. and her boyfriend went to a Super Bowl party and left Natalie in charge of the two younger children. The two adults left the apartment about 2 p.m. and told Natalie that they would be back around dark.

Soon after Mrs. P. left, Natalie let the two boys go outside to play and she watched the Super Bowl. Just before dark, the two small boys knocked on the door to ask Natalie if they could ride their bikes. When she opened the door, defendant was also standing at the door with some dresses in a plastic bag; he asked Natalie if she wanted to buy any of them. She thought he was looking at her funny. He was wearing a black, hooded sweat shirt with a large pocket across the front and blue jeans. He also appeared very drunk. Natalie had seen him earlier, walking with a woman with long, black hair, who was crying.

Before Natalie could answer defendant, he stepped inside the apartment and began pulling out the dresses. He asked her if she wanted to buy the dresses and whether she had any money or any rock. He was speaking English although later on he spoke in Spanish. After Natalie told defendant that she did not want any of the dresses, he took his things and left.

However, as soon as Natalie closed the door, she noticed that defendant had left a skirt, so she opened the door and yelled to defendant, who was still nearby, that he had left a skirt. Defendant looked up and down the street and then came back to the apartment. Defendant then pushed his way into the apartment even though Natalie told him no. At this point, she became scared and started to back up. As soon as he was inside, defendant locked all three locks on the door. At this point, Natalie became frightened.

Defendant began speaking in Spanish, telling Natalie that she was pretty and grabbing her. She tried to fight him off and told him no but he was holding her wrists so she could not get away. She was wearing black thermal leggings, a T-shirt, and underpants. She was not wearing a bra. Defendant pulled up her shirt and put his mouth all over her, including her breasts, and told her in English that he wanted to do everything. Natalie continued to struggle with him and told him no but he threw her on the couch and, with his tongue sticking out, tried to kiss her face and mouth. As defendant was leaning over her, something shiny fell out of his sweat shirt pocket which he

picked up and put back. However, Natalie got scared. Thinking the object was a knife, she reached inside defendant's pocket to retrieve it and felt a beanie-type hat and the object which, after she pulled it out, she saw was a blue-green lighter. Defendant grabbed the lighter and put it back in his pocket.

Defendant then pulled down Natalie's pants and underwear, and put his mouth between her legs and on her vagina. She screamed but was unable to get away from defendant, so she told him that she had AIDS in the hopes that he would leave her alone. Defendant, however, continued to lick her and to tell her that he wanted to do everything, and then got up and started to remove his belt, again telling her that she was pretty and that he wanted to do everything. Defendant then released Natalie and stood up, presumably to pull off his pants. Natalie pulled up her own pants and grabbed defendant's belt so that he could not remove his pants. They continued to wrestle with each other for a while, and then Natalie broke loose and ran to the kitchen where she grabbed two large kitchen knives. Seeing the knives, defendant grabbed his plastic bag of clothes, unlocked the front door, and ran out. On his way out, he said something about coming right back, that he was just going out to get a rubber.

Natalie was crying and, as defendant was leaving, her two little brothers came running to the door. She told them to come inside and told Johnny, the older one, to run down to the pay phone a block away and call the police because "some Mexican dude tried to rape me." When Johnny returned, Natalie locked the door and waited for the police who arrived about three minutes later.

When the police arrived, at about 6 p.m., they found Natalie crying and hysterical, holding two large kitchen knives. She gave the police a description of defendant and the police took her clothes, underwear, and a black skirt that defendant had left behind. Later, at the request of the officers, Natalie was taken to another location where she positively identified defendant as her assailant. He was wearing the same clothes that Natalie had described. Natalie told the officers about the cigarette lighter in defendant's pocket and, when an officer checked defendant's pocket, he found a blue-green lighter and a beanie-type hat.

Officers also found in defendant's wallet a photograph of the same woman that Natalie had seen with defendant earlier that day. It was a picture of his girlfriend, Juanita C. Officers contacted Juanita in an apartment on Goodman Street, where they found a white cellophane grocery bag containing a number of women's garments. The officers seized the bag and its contents which matched Natalie's description. The bag also contained a blouse which matched the skirt left by defendant in the apartment.

*Defense.*

Defendant testified in his own behalf. He denied engaging in any sexual contact with Natalie, denied lifting up her skirt, pulling down her pants, or licking her breasts. Defendant testified that he went to try to sell Natalie some dresses. When he was showing her the dresses, his lighter fell out of his pocket and he picked it up and put it back in his pocket. Natalie liked one of the dresses. However, when defendant told her it was $20, she told him that she did not have any money and offered to trade her body for the dress. Defendant told her he needed the money to go to Los Angeles, and Natalie got angry and began to swear at him. They exchanged racial insults and he left and went to a friend's home. When the police stopped and arrested him, he was uncooperative because he felt they did not have any reason to stop him.

DISCUSSION

I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### III.   *Did the Trial Court Err in Failing to Instruct the Jury That Defendant's Misdemeanor Convictions Could Only Be Used for Credibility?*

In the instant case, the trial court correctly instructed the jury with CALJIC No. 2.20: "In determining the believability of a witness, you may consider anything that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness including, but not limited to, any of the following: . . . [¶] The witness' prior conviction of a felony or *misdemeanor*." (Italics added.)

The court then continued to instruct on witness credibility and, among the instructions following CALJIC No. 2.20, the trial court gave CALJIC No. 2.23. The court stated: "The fact that a witness has been convicted of a felony, if such be a fact, may be considered by you only for the purpose of determining the believability of that witness. The fact of such a conviction does not necessarily destroy or impair a witness' believability. It is one of the circumstances that you may take into consideration in weighing the testimony of such a witness."

■ Obviously, the trial court neglected to insert the words "or misdemeanor" as it had asserted them in CALJIC No. 2.20. Defendant contends this omission constituted reversible error. Defendant relies on a decision by this court, *People* v. *Mayfield* (1972) 23 Cal.App.3d 236 [100 Cal.Rptr. 104],

---

*See footnote, *ante*, page 649.

which ruled that the trial court must instruct sua sponte as to the limited purpose for which evidence of prior felony convictions is admissible. Defendant argues that this requirement should be extended to his misdemeanor convictions which, under *People* v. *Wheeler* (1992) 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938], were properly admitted in the absence of a hearsay objection. We agree. The trial court ought to have done so.

In *Mayfield*, the district attorney elicited testimony from the defendant that she had been convicted of manslaughter. The defendant claimed that the failure of the trial court to either admonish the jury during trial or instruct at the conclusion of the trial that evidence of the prior conviction of a felony was admissible for the limited purpose of attacking her credibility was reversible error. (*People* v. *Mayfield, supra,* 23 Cal.App.3d at p. 244.)

The court cited Evidence Code section 788 as permitting evidence of prior felony convictions only "for the purpose of attacking the credibility of a witness." The court reasoned: "It is to be noted that the very section which makes such evidence admissible confines it to impeachment of the witness' credibility. Thus it is implicit from the wording of the section that the jury shall be admonished as to the limited application they may give such evidence. Here, the jury was never advised as to the limited purpose for which the evidence was presented to them. We conclude that this violated the admonition contained in section 788, that the evidence is admissible for a limited purpose." (*People* v. *Mayfield, supra,* 23 Cal.App.3d at p. 244.)

The court in *Mayfield* based its conclusion on the holding in *People* v. *Beagle* (1972) 6 Cal.3d 441, 452 [99 Cal.Rptr. 313, 492 P.2d 1], which stated in relevant part: " 'Section 788 is an exception, indeed the only exception, to the rule that "evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness." (Evid. Code, § 787.) In providing this exception the Legislature used the permissive word "may" rather than a mandatory word such as "shall." We conclude that the choice of language leaves the trial court with discretion to exclude proof of prior felony convictions offered in impeachment [under Evid. Code, § 352]. . . .' " (*People* v. *Mayfield, supra,* 23 Cal.App.3d at p. 245.)

Although *Mayfield* was decided before Proposition 8, its reasoning is still viable. California Constitution article I, section 28, subdivision (f) still contemplates a limitation on the use of felony convictions and the *Wheeler* court's extension of section 28, subdivision (f) to admission of conduct leading to a misdemeanor conviction also maintains this limitation. Although *Wheeler* does not include specific directions to the trial court to instruct sua sponte on the limited application of the prior convictions, whether felony or

misdemeanor, to credibility, we conclude that because the purpose of admitting the prior convictions continues to be limited under Proposition 8, the directive set forth in *Mayfield* is applicable here. The trial court erred by failing to include misdemeanors in its instruction. However, as we further concluded in *Mayfield*, such a failure to instruct is not reversible error per se. (*People* v. *Mayfield, supra*, 23 Cal.App.3d at p. 245.) In *Mayfield*, the court stated: "Since the error is not of constitutional dimensions, the test for determining prejudice is whether our examination of the entire cause, including the evidence, reveals it is reasonably probable that a miscarriage of justice resulted. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)" (*Ibid.*)

In the instant case, the jury was advised that in making its credibility determination, it could take into account the witness's prior conviction of a felony or misdemeanor. Then, within the same category of witness credibility, the jury was further instructed it must only consider the fact that the witness was convicted of a felony for the purpose of determining the believability of the witness. In our view, it is not reasonably probable, given the sequence of instructions and their content, the closing arguments in which counsel specifically addressed the limited purpose for which defendant's prior convictions, both felony and misdemeanor, could be considered, i.e., defendant's credibility, that the jury was confused about how it would consider the misdemeanors. Even without the additional two words in the limiting instruction, and upon examination of the entire cause, it is not reasonably probable that a miscarriage of justice resulted. The test of whether the jury would have reached a different verdict is based on a reasonable probability rather than on mere possibilities. (*People* v. *Watson* (1956) 46 Cal.2d 818, 827 [299 P.2d 243].) The trial court's omission of the term misdemeanor in its limiting instruction was not prejudicial.

IV.-VI.*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## DISPOSITION

The judgment is affirmed.

Best, P. J., and Thaxter, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 26, 1994.

---

*See footnote, *ante*, page 649.