[No. S044677. Dec. 16, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
DANNY RAY HORNING, Defendant and Appellant.

## Counsel

John F. Schuck, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Eric L. Christoffersen and Erik R. Brunkal, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**CHIN, J.**—A jury convicted defendant Danny Ray Horning of the first degree murder of Sammy McCullough under the special circumstances of robbery murder and burglary murder and with personal use of a handgun. (Pen. Code, §§ 187, 190.2, subd. (a)(17), 12022.5, subd. (a).)[1] After the guilt verdict, defendant waived his right to a jury trial as to further proceedings. The court then found true that defendant had suffered three prior serious felony convictions. (§ 667, subd. (a).) After a penalty trial, the court found that death was the appropriate penalty, and it imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## I. The Facts

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

The victim, Sammy McCullough, was a marijuana dealer and fish farmer who lived in a geodesic dome house on East Mariposa Road, near the end of Clark Drive, in a rural area of Stockton. He was known to keep large amounts of cash at his home. Between 1988 and 1990, he told others that he had sometimes been burglarized. Telephone records showed that McCullough tried to call his friend and business partner Kevin Crowley around 7:00 p.m. on September 19, 1990. He was not heard from after that evening.

During the evening of September 20, 1990, Mark Lawson was fishing in a portion of the San Joaquin River Delta near Highway 4 called Burns Cut. He found in the water a bag containing a man's leg. He "got out of there pretty quick" and called the police. Over the course of the next day or so, authorities found other body parts in the water at Burns Cut, including a bag containing two arms that were tied together at the wrists with duct tape, a torso wrapped in a bed sheet, and a head floating freely, with tape wrapped around it covering the eyes. A serrated knife that could have been used to dismember the body was found with the torso. Fingerprint comparison revealed that the body was McCullough's. McCullough's wallet, containing no money, was found in the pants on the torso. A .22-caliber bullet was found in McCullough's brain. An autopsy revealed that McCullough had been killed by a single gunshot wound to the forehead fired from close range, within two inches. The body had been dismembered after death.

James Casto was camping at Burns Cut the evening of September 19, 1990. He saw a "white, square-backed vehicle" drive back and forth a "couple of times" going "kind of fast." The vehicle stopped a short distance away, and Casto "heard something thrown out into the bushes and into the water down there." He told the sheriff's department the vehicle might have been a Toyota or a station wagon type of car. When shown photographs of McCullough's white Jeep Cherokee, Casto said the vehicle he saw had the "same shape."

McCullough's Jeep Cherokee was found in Stockton on September 21, 1990. The mats in the back were moist and the vehicle was very clean. The Jeep contained checks in McCullough's name and car ownership documents. An expert testified that an unknown person other than McCullough had signed McCullough's name to some of the checks and car ownership documents. It appeared the person had tried to trace McCullough's signature.

One of the documents contained the date September 21, 1990. Defendant's thumbprints and fingerprints were found on two of the car ownership documents. No other usable fingerprints were found inside the Jeep. Some usable prints were found on the Jeep's exterior, but they did not belong to defendant or any of several others with whom they were compared.

A search of McCullough's home revealed human blood in the bathroom. A piece of human tissue was found on the bathroom mirror. A set of knives with one missing was found in the kitchen. Bags and tape like those used to wrap and bind the body parts were found in the house. A .22-caliber bullet casing was found just outside the front door.

On September 21, 1990, Vicki Pease and Shirley Sanders, both girlfriends of McCullough, and Crowley gathered at McCullough's house before the police arrived. They removed some items from the house, including legal papers and a Rolex watch. Pease later told Deputy Sheriff Armando Mayoya, the lead investigator in the case, what they had done. Pease also testified that various items were missing from the house, including McCullough's nine-millimeter handgun. She said the handgun "never left [McCullough's] side." She had seen it at McCullough's house as recently as September 18, 1990, the last time she was there. Sanders testified that McCullough accumulated spare change in a planter box in the house. The planter was "heaping" in change, so much so that Sanders had "started another one in a coffee can." After McCullough's death, the coins were no longer there.

Cynthia Ann Cuevas, defendant's sister, testified that defendant had been trying to find a job the summer of 1990. She saw defendant and their brother, Steven Horning, on September 19, 1990. Her brothers were supposed to fix her car. However, they could not do so at that time because a necessary part was unavailable. Cuevas arranged with her brothers to return to fix the car on September 21, 1990, but they never did. The parties stipulated that, if called as witnesses, defendant's parents would testify that in September 1990, defendant lived in a trailer on their property at 2606 Munford in Stockton. Defendant had told them he needed money. He and Steven Horning left unexpectedly after the two had gone to fix Cuevas's car. Steven returned a few days later, but defendant never returned.

Defendant had been released on parole from prison on June 16, 1990. His parole agent testified that she had had her last monthly contact with him on September 16, 1990, in his trailer on Munford. As of that time, he had been abiding with the conditions of his parole, although he did not have a full-time job. On October 10, 1990, the parole agent tried to contact defendant. Steven Horning told her that defendant was gone. Because of this, the parole agent listed him as a "parolee at large," meaning that he had "absconded supervision."

The parties stipulated that, if called as a witness, Ray Van Vleet would testify that he was the sheriff of Caribou County, Idaho. On September 23, 1990, he received a report of an abandoned vehicle on a mountainside near Olsen Creek. He checked the vehicle. It was a 1976 Monte Carlo that Cuevas testified Steven Horning and defendant had driven. Shortly after he checked it, the vehicle was moved.

John Sharp testified that he had a ranch in Freedom, Idaho, where he raised hay and grain. On October 20, 1990, he saw defendant coming out of the mountains. Defendant told him he was going to Henry—which was about four miles away—but then he offered to help Sharp work on the hay. Defendant said he had walked over the mountains and was staying "up there on the hill." He said that "he'd had trouble with his family, and he liked to go out and camp," and that "his brother brought him up." When asked whether he had a tent, he said he had "a canvas." He said he planned to stay there all winter. Sharp told him he could not "stay there all winter. You'll freeze to death." He offered to let defendant stay in a cabin he owned.

Wade Carney testified that he worked in a country store in Wayan, Idaho, about seven to eight miles from Freedom. During the winter months of 1990, defendant came to his store about three or four times to buy groceries. Defendant paid with "change most of the time." He had a lot of money in change. Defendant explained that he had been saving his change to go deer hunting. Carney once picked up defendant's bag of coins; he estimated it weighed about 50 to 75 pounds.

On October 26, 1990, Sheriff Van Vleet contacted defendant at an abandoned cabin near Soda Springs, Idaho. Defendant told him he had received permission from the owner to use the cabin and gave his name and other identifying information. Sheriff Van Vleet later ran a check on defendant. He learned that the birth date defendant gave him did not match, and that defendant had an outstanding warrant for parole violation. Sheriff Van Vleet returned to the cabin the next day, only to discover that defendant had left, leaving behind a note and a calendar. Handwriting comparison established that defendant had written items on the calendar. The note contained defendant's signature and three messages telling "John" (presumably John Sharp) to let himself in.

Defendant was arrested in Winslow, Arizona, on March 22, 1991, while committing a bank robbery. A nine-millimeter SIG Sauer handgun with the serial number U126340 was in his possession. Sales documents containing that serial number and trial witnesses established that Joseph Cutrufelli had purchased that gun and later gave it to Nicholas Montano. Montano testified that in 1988 he gave McCullough the gun he had received from Cutrufelli.

Vicki Pease positively identified that gun as the gun that McCullough had continually possessed and that she had seen in McCullough's house on September 18, 1990. She specifically recognized some scratches on the gun, which she accidentally had made. Shirley Sanders testified that the gun looked "exactly like" McCullough's gun. She had occasionally fired the gun herself near McCullough's barn. Six nine-millimeter casings were found in that area. Ballistics examination established that the gun found in defendant's possession had fired those casings. That gun did not fire the bullet found in McCullough's brain.

The parties stipulated that, if called as a witness, defendant's father would testify that about a week before September 20, 1990, he saw defendant firing a .22-caliber rifle behind the trailer in which defendant lived on the family property on Munford in Stockton. Sheriff's deputies found a .22-caliber bullet, a wooden piece of a rifle stock, and a sawed-off Westerfield .22-caliber rifle barrel on that property. The wooden stock and the barrel could have been parts of the same gun.

Michael Giusto, a criminalist with the California Department of Justice, compared the bullet found in McCullough's brain and the .22-caliber casing found near McCullough's front door with the gun barrel and the .22-caliber bullet found on defendant's property. Because of various consistencies among them, Giusto opined that both bullets and the casing could have been fired from the same gun, and that the barrel could have been part of that gun; because of their condition he could not say for sure. Giusto testified that if the two bullets had been fired from separate weapons, he would not expect to see the matching characteristics because "each gun barrel has its own unique markings. And the bullets fired through these barrels would be marked accordingly." But he could not quantify the probability that the bullets were or were not fired from the same gun.

Timothy Horning, another of defendant's brothers, testified that he had lived in the trailer on the family property on Munford until the end of August 1990. When he moved out, he left some clothes behind, including some black Nike shorts and a tank top that defendant sometimes wore. The shorts "look like" some shorts that were found inside one of the plastic bags taken from Burns Cut, and the tank top was similar to a tank top found in a bedroom of McCullough's house. Timothy testified that defendant grew up hunting and fishing, and he sometimes went fishing with defendant at Burns

Cut.[2] Defendant had experience with dismembering deer in a fashion similar to the way McCullough's body was dismembered. Sometimes the deer meat would be kept in garbage bags.

Willie Eoff, defendant's cousin, testified that in the summer of 1990, he twice drove defendant and Steven Horning to the end of Clark Drive in Stockton (i.e., near McCullough's house). Both times defendant and Steven left on foot, were gone about half an hour, and returned with some marijuana.

Deputy Mayoya interviewed defendant in Arizona after his arrest. He tape-recorded the interview secretly. After Deputy Mayoya explained his constitutional rights, defendant agreed to talk with him. He denied having killed McCullough. Deputy Mayoya asked where defendant had obtained the nine-millimeter handgun in his possession. Defendant said he had bought it for $400 at a McDonald's in Salt Lake City, Utah, when he was on his way to Idaho from California. He said he had left California the day after his parole officer had visited his home. He also said that he and Steven had arranged to fix his sister's car, but a part was not available. He said "we" left Stockton, went to Las Vegas, then through Utah to Idaho. When Deputy Mayoya asked who "we" referred to, defendant refused to say. Deputy Mayoya told him he had learned that defendant and Steven Horning had gone to Idaho. Defendant responded, "[T]hat's what you learned from Steven then I'm not going to contradict him." He also said that he had used the nine-millimeter gun to shoot a moose, after which he had "quartered the moose." Defendant said that after Sheriff Van Vleet contacted him at the cabin, he thought the sheriff would return. So he went to a ridge in the area the next day and watched two sheriff's cars approach the cabin. He "figured they were going to come get him," so he "took off and went up into the mountains."

Deputy Mayoya asked defendant about a 1988 robbery of McCullough that his brother Steven had been charged with. Defendant said Steven had not done it. When Deputy Mayoya told defendant that Steven had said that defendant did it, defendant responded "that if Steven said I did it, then I won't contradict him," but he also denied having done it. Defendant said that he had not possessed or touched a .22-caliber rifle since November 1988. He admitted firing a .38-caliber gun, but not a .22. He also denied ever having been to McCullough's house. Deputy Mayoya told defendant he did not

[2] At the preliminary hearing, Timothy testified that only his other brothers, but not defendant, had fished with him at Burns Cut. When confronted with this testimony at trial, he ultimately said he could not remember for sure whether defendant had fished with him at Burns Cut. Earlier, Timothy had told Deputy Mayoya that defendant had fished there with him. At trial, Timothy said that his memory was better when he spoke with Deputy Mayoya than at trial, and that he had told Mayoya the truth.

believe him about the gun, that it was "BS." Defendant responded to the effect, "I know it is, but that's all you're going to get . . . . If you ask me three times or 30 times, the stor[y's] going to be the same." When Deputy Mayoya mentioned that the gun had belonged to the murder victim, defendant replied with something like, "[O]h, gee, that's a coincidence, what a coincidence." When asked whether anyone would believe the gun was "found 1100 miles away at a McDonald's," defendant said, "God, what a coincidence." Defendant said he thought the odds against that happening were something like "a zillion to one." When Deputy Mayoya told him he found it hard to believe, defendant responded, "[H]e didn't believe it himself, but that's what he was going to stick to." Later, when Deputy Mayoya told defendant he did not believe him about finding the gun at McDonald's and about not having fired a .22-caliber gun, defendant said something to the effect, "[Y]eah, I know I'm lying, but that's all you're going to get."

Jan Biaruta testified that he spoke with defendant when the two were incarcerated together in Arizona in April 1992. Defendant said he was wanted for a killing in California, "and he got caught in Arizona for bank robbery and he was glad that he did because he didn't have to face extradition." Defendant said the person he killed "was a drug dealer, that it was no big loss," and that he "had it coming."

2. *Defense Evidence*

Defendant presented the stipulated testimony of two witnesses. The parties stipulated that if called as a witness, Larry Hastings would testify as follows. He lived near Salt Lake City, Utah. He sold marijuana that he received from Gabriel Aguirre, a major supplier, to McCullough for, as McCullough told him, resale at a profit of two to three times what McCullough paid. Hastings estimated that McCullough bought over 5,000 pounds of marijuana over a period of a little more than a year. McCullough always paid in cash, ranging from $250,000 to $400,000 or more, that he had in gym bags. McCullough came to Salt Lake City at least six or seven times during the time he dealt with Hastings, and Hastings never saw him with a gun during these trips. Hastings sold his marijuana business to Gregory Frischknecht in 1988 for $40,000 but continued to keep in contact with McCullough. McCullough spoke with him by telephone a few times the last week of his life.

In early September 1990, McCullough asked Hastings for help getting marijuana for resale. About a week before his death, McCullough sent Vince Lauricica to Utah to buy 26 pounds of marijuana for $70,000, which was to be delivered to McCullough in California. During this time McCullough told Hastings that two persons were following him, and when McCullough went to the vehicle in which the two were sitting, he saw a photograph of himself

in the vehicle. McCullough told Hastings he had brought in two "hit men" from out of state to kill a person who had been stealing from him and who had been charged with robbing him at McCullough's home during the time that Hastings and McCullough were dealing marijuana. McCullough told Hastings he later decided not to have the person hit.

In early September 1990, federal drug authorities seized Frischknecht's assets and later arrested him. Frischknecht was "doing time in federal prison" for his role in the drug ring. Federal agents also arrested Hastings and charged him in connection with his role in the drug ring. Hastings agreed to cooperate as a witness against Gabriel Aguirre. When he testified, he was serving a 10-year sentence in federal prison, a reduced sentence in return for his cooperation.

The parties also stipulated that if called as a witness, Frischknecht would testify as follows. He and McCullough became involved together in a marijuana sales operation in early 1989. Frischknecht delivered marijuana around the country on Aguirre's behalf. He made two marijuana deliveries, totaling about 700 pounds, to McCullough at his home on Mariposa in Stockton. On one trip, Frischknecht was introduced to McCullough's partner in the marijuana business. Frischknecht described this partner and, after viewing photographs, said it was not defendant, Steven Horning, or Kevin Crowley. McCullough flew to Reno, Nevada to pay Frischknecht for the marijuana. McCullough paid between $200,000 and $300,000. McCullough flew to Salt Lake City for one of the transactions and inspected the marijuana there before Frischknecht delivered it to Stockton. McCullough gave Frischknecht $140,000 at that time and paid the balance of the $300,000 purchase price a few weeks later.

Frischknecht had almost weekly telephone conversations with McCullough during the spring and summer of 1990 that Frischknecht later learned were intercepted by federal wiretaps. In early September 1990, an assets seizure case was begun against Frischknecht. He contacted McCullough to try to find out what the government was doing. He paid McCullough $7,500 to gain information that might help him fight the asset seizure action. McCullough told him that "he had friends in positions of authority who could help him . . . get information." McCullough also told Frischknecht that persons were "dogging" him at the time. The two of them concluded it had something to do with the ongoing investigation into their drug activities. Frischknecht testified in the Aguirre trial in February 1994.

B. *Penalty Phase*

1. *Prosecution Evidence*

After the guilt verdict, defendant waived his right to further jury trial. The prosecution first proved to the court that, before McCullough's murder, defendant had suffered three felony convictions: robbery convictions in 1982 and 1983 in Monterey County and a 1988 conviction in San Joaquin County for a lewd and lascivious act on a child under the age of 14. The prosecution also presented evidence of crimes defendant committed after McCullough's murder.

At some point after he left the cabin in Idaho, defendant robbed a bank in Pocatello, Idaho, in which he used a nine-millimeter SIG and stole $5,000. On December 27, 1990, he robbed a bank in Eugene, Oregon, in which he used a handgun. On March 22, 1991, he robbed a bank in Winslow, Arizona, at gunpoint, of $25,000. As he was leaving the bank with the money and a hostage, a police officer captured him. After his capture, he said that he "would have blown the cop away" if he had had the opportunity. Sometime later, defendant escaped from prison.

On June 25, 1992, defendant entered the car of Adam Lakritz and Katherine Falk in Flagstaff, Arizona, and at gunpoint, forced them to drive to the Grand Canyon. Defendant placed his gun into Lakritz's ribs and threatened to shoot him and Falk; he continued to threaten them throughout these events. Defendant told Falk he wanted to kidnap a family with small children and hold them for a million-dollar ransom and the release from jail of one of his brothers. He forced Lakritz and Falk to spend the night with him at a hotel. The next day, defendant forced them to drive to Williams, Arizona, where he obtained $1,500 using Lakritz's credit card. They then returned to the Grand Canyon, where defendant, while still holding Lakritz and Falk hostage, attempted to kidnap a family of four in a motor home. Before he did so, while sitting with Falk and Lakritz in the car parked next to the targeted motor home, defendant dictated a ransom tape, using a microcassette in the car. As Falk described it, defendant demanded "money in certain denominations, [his] brother's release, a red truck." Defendant threatened to kill the "six hostages" (Lakritz and Falk and the four persons in the motor home), saying "he would just blow away half the hostages and go on from there." After defendant finished dictating his demands, he "pulled a gun" on the family and said they were his "hostages." One family member escaped and informed Don Miller, a Grand Canyon park ranger, who arrived to foil the kidnapping. Defendant fled with Lakritz and Falk in their car, pursued by Ranger Miller, and a high-speed chase ensued. During the chase, defendant

shot at Ranger Miller and another patrol car several times through the rear window and out the side of the car. Eventually, defendant escaped on foot into the woods.

On June 29, 1992, defendant attempted to abduct at gunpoint two persons in a picnic area in the Grand Canyon. They escaped, but defendant drove away in their car, which he later abandoned.

On July 4, 1992, at the Grand Canyon, defendant entered the rented car of Sally Edmonds and Caroline Young, tourists from England, and at gunpoint, forced Edmonds to drive away, with defendant sitting in the back and Young in the front. He threatened to shoot through the gas tank if they "did anything silly." He forced Edmonds to stop in an isolated area near the town of Williams, where he ordered Edmonds and Young out of the car. He tied their hands together around a tree, took about $15 from them, and left with their car. Highway Patrol Officer Stephen Costello observed defendant driving the car. The car passed him going about 100 miles per hour. Defendant shot at him, hitting the officer's car. Officer Costello followed defendant, but defendant skidded to a stop, hitting a sign, and escaped on foot.

2. *Defense Evidence*

Defendant presented two types of evidence at the penalty phase: evidence to try to create a lingering doubt as to his guilt of McCullough's murder and evidence in mitigation.

David Butler, an expert in firearms identification, testified that he could not determine whether the bullet found in McCullough's brain and the bullet found on defendant's property were fired from the same gun. He did "not disagree with Mr. Giusto's findings," but disagreed with the way he described them. He preferred to say the testing was "inconclusive." The bullet from McCullough's brain "show[ed] no evidence having been fired from a sawed-off rifle," but he could not say for sure. Dr. Louis Daugherty, a pathologist, testified that he did not believe the serrated knife found with the victim's torso could have made some of the bone cuts found on the victim, although it could have made some of the other cuts.

Cynthia Cuevas, defendant's sister, testified again. This time she said she believed that defendant and Steven last came to her house on September 20, 1990, not September 19. Defendant's brother Rodney confirmed some of her testimony but could not remember any of the dates. Rodney also said he had never been at Burns Cut with defendant or Steven Horning and never saw a sawed-off .22 at the Horning property in 1990. Defendant's brother Mark testified that he used to work for McCullough at the Mariposa property and

observed marijuana transactions. McCullough sometimes told him about burglaries. Jacques Colblack testified that some of the Hornings' neighbors kept rifles "laying around." John McFeley testified that there had been a lot of garbage on a piece of property next to the Horning home. Officer James Smith testified that around 1990 to 1991, he confiscated a sawed-off shotgun from a house just east of the Horning home.

Shelley Ann Horning, defendant's wife, testified that they had three children and had lived as a normal family for a time in 1987 to 1988. Aside from an incident involving his daughter for which he was arrested and sent to prison, defendant was a "caring and loving" father who was "real close" to one of his sons. It would be hard on their children if defendant were on death row. She believed "we all have a good inside of us, and I do know that [defendant] has good in him." She did not want him to be executed.

Vicki Zachary testified that she used to be abused by her father. When she was about 14 or 15 years old, defendant helped her get away from her father. She met defendant through church, which they attended together. She believed that defendant is a "good guy with a good heart." According to her, defendant had a habit of saving and keeping coins.

Defendant testified on his own behalf. He denied killing McCullough. He noted that he had consistently admitted his guilt of other crimes, including crimes he had not yet been charged with, but always denied killing McCullough. He denied ever seeing the sawed-off rifle barrel found on the Horning property. He said he did fire the .22-caliber bullet found on the property, but not from a sawed-off rifle. He denied ever meeting McCullough, being on McCullough's property, or fishing at Burns Cut. He admitted possessing the nine-millimeter handgun taken from him when he was arrested in Arizona and explained how he got it. He said he had left California on September 20, 1990, because he was afraid his parole officer would send him back to prison for not finding a job. Before he left California, he saw a vehicle parked in a parking lot. He entered the vehicle; thumbed through some papers, looking for money and took the gun from the car. He lied to Deputy Mayoya about getting the gun in Utah because he had heard that it was linked to a homicide in Stockton and he felt that Deputy Mayoya was also lying to him. When he left California, he took some coins with him that he had accumulated.

Defendant believed that he was a "[g]ood guy with a good heart who does bad things." The worst thing he ever did was molest his six-year-old daughter, for which he would never forgive himself. Defendant testified about the crimes he committed after leaving California. He said he always tried to make the others who were involved "as comfortable as possible"; he tried to

treat them "like a human being, instead of an animal." He said he attempted six bank robberies, five successful and one (presumably the one in Winslow, Arizona) unsuccessful. During his bank robberies, "ninety-nine percent of the time [his gun] was in [his] shoulder holster." He denied ever shooting at anyone with the intent to hit them. As a result of military training, he was an expert marksman; if he had intended to hit anyone, he would have done so. He noted that he had had many opportunities to kill his victims but had never done so. He admitted making a tape of demands in which he threatened to kill hostages, shoot police officers, and commit acts of arson and terrorism, but said he did not intend to actually do so. He was just "bluffing" and "never expected [he would] have to" carry out the threats.

Defendant described some of the good things he had done in his life. He helped his "16-year-old sweetheart Vicki Zachary," helped John Sharp take in the hay, helped his sister in Washington State when her son had been in a car accident, and gave food and other things to a homeless shelter. He was always "there" when a family member or friend needed anything. "[W]hether I know the people or not, if I see a need and if I'm capable of handling it, I offer my assistance." He loved his wife very much. He would like to continue to have a relationship with his three children and believed it would be more stressful for them if he received the death penalty than if he received life without parole. He said "it would be very hard for me to cope with the fact that [the judge] could find me guilty enough to give me the death penalty for something I did not do."

## II. Discussion

### A. *Delay in the Prosecution*

McCullough's murder occurred in September 1990. On December 4, 1990, while defendant was still at large, the district attorney filed a complaint charging defendant and his brother, Steven Horning, with the murder. (The charge against Steven Horning was later dismissed.) On March 22, 1991, defendant was arrested in Arizona on other charges. He was convicted of crimes in that state in May 1991 and received four consecutive life sentences. In a letter dated November 26, 1991, Detective Mayoya of the San Joaquin County Sheriff's Department informed the Arizona Department of Corrections that defendant was accused of McCullough's murder. Detective Mayoya stated that the district attorney had decided not to extradite him "due to the fact that Horning was sentenced to four consecutive life terms for the crimes relating to the bank robbery in Winslow. Horning to my understanding will have to serve 100 years before he is eligible for parole." Detective Mayoya asked to "be notified of any change of his sentence, due to appeal or retrial, as a reduction in sentence may warrant extradition to California." The letter attached a copy of the arrest warrant "for use as a detainer."

In May 1992, defendant escaped from custody in Arizona and committed additional crimes. He was rearrested in Arizona in July 1992. On July 22, 1992, the district attorney filed an amended complaint that again charged defendant with McCullough's murder. As of August 1992, however, the district attorney had not yet decided to extradite him. On May 12, 1993, another amended complaint was filed against defendant, charging him with McCullough's murder and, for the first time, alleging special circumstances. Defendant appeared in court on this charge for the first time on May 20, 1993.

Defendant moved in the superior court to dismiss the charges due to the delay before he was arraigned on May 20, 1993. The court denied the motion. Defendant contends the court erred and that the two-and-a-half-year delay between the filing of the first complaint in December 1990 and his arraignment in May 1993 violated his rights under both the United States and California Constitutions.[3] We disagree.

The Sixth Amendment to the United States Constitution protects the defendant's right to a speedy trial. (See *People v. Roybal* (1998) 19 Cal.4th 481, 512 [79 Cal.Rptr.2d 487, 966 P.2d 521].) Defendant argues that the complaint filed on December 4, 1990 (while he was still at large) triggered his federal speedy trial rights. He is incorrect. "Under the *federal* Constitution, . . . the filing of a felony complaint is by itself insufficient to trigger speedy trial protection. [Citation.] The United States Supreme Court has defined the point at which the federal speedy trial right begins to operate: '[I]t is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment.' (*United States v. Marion* (1971) 404 U.S. 307, 320 [30 L.Ed.2d 468, 92 S.Ct. 455].)" (*People v. Martinez* (2000) 22 Cal.4th 750, 754–755 [94 Cal.Rptr.2d 381, 996 P.2d 32].) Thus, the complaint filed in December 1990 did not trigger defendant's federal speedy trial right.

Defendant also argues that at least the letter from Detective Mayoya to the Arizona authorities, dated November 26, 1991, which attached an arrest warrant "for use as a detainer," triggered his federal speedy trial protection. That letter was not a formal indictment or information. It also did not cause defendant's actual restraint on these charges. He was not extradited at that time, and he remained incarcerated in Arizona due to conviction of charges in that state. The letter did not cause the government to "arrest[] him and thereby commence[] its prosecution of him." (*Dillingham v. United States*

[3] Defendant claims only a violation of his *constitutional* speedy trial rights. He does not claim, and the record does not demonstrate, a violation of his *statutory* speedy trial rights. (See § 1382.)

(1975) 423 U.S. 64, 65 [46 L.Ed.2d 205, 96 S.Ct. 303].) Accordingly, the federal protection attached only when he was actually restrained on these charges in May 1993. Defendant does not complain of delay after that time.

Even assuming that, as the trial court found, defendant's federal speedy trial protection attached when Detective Mayoya sent the November 26, 1991, letter to the Arizona authorities, he would not be entitled to relief. The United States Supreme Court has noted that unreasonable delay between formal accusation and trial threatens several harms, "including 'oppressive pretrial incarceration,' 'anxiety and concern of the accused,' and 'the possibility that the [accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence." (*Doggett v. United States* (1992) 505 U.S. 647, 654 [120 L.Ed.2d 520, 112 S.Ct. 2686] (*Doggett*); see *People v. Roybal*, *supra*, 19 Cal.4th at p. 512.)

In deciding whether to grant relief due to unreasonable delay in the prosecution, courts must consider what the high court refers to as the four "*Barker*" factors (*Barker v. Wingo* (1972) 407 U.S. 514 [33 L.Ed.2d 101, 92 S.Ct. 2182]): "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." (*Doggett*, *supra*, 505 U.S. at p. 651.) "The first of these is actually a double enquiry. Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay . . . . If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim. . . . [T]he presumption that pretrial delay has prejudiced the accused intensifies over time." (*Id.* at pp. 651–652.) The court indicated that postaccusation delay is considered presumptively prejudicial "at least as it approaches one year." (*Id.* at p. 652, fn. 1; see also *id.* at p. 658.)

The high court has explained that in this context, the term "presumptive prejudice" "simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." (*Doggett*, *supra*, 505 U.S. at p. 652, fn. 1.) "[A]ffirmative proof of particularized prejudice is not essential to every speedy trial claim," because "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria [citation], it is part of the mix of relevant facts, and its importance increases with the length of delay." (*Id.* at pp. 655–656.) The court also noted "that pretrial delay is often both inevitable and wholly justifiable. The

government may need time to collect witnesses against the accused, oppose his pretrial motions, or, if he goes into hiding, track him down. We attach great weight to such considerations when balancing them against the costs of going forward with a trial whose probative accuracy the passage of time has begun by degrees to throw into question." (*Id.* at p. 656.) " '[D]ifferent weights [are to be] assigned to different reasons' for the delay." (*Id.* at p. 657.) "[T]o warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice." (*Ibid.*)

The *Doggett* court found the accused in that case entitled to relief due to an "extraordinary 8 1/2 year" delay, of which six years was attributable to the "Government's inexcusable oversights." (*Doggett*, *supra*, 505 U.S. at pp. 652, 657.) "When the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review . . . , and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, . . . nor persuasively rebutted, the defendant is entitled to relief." (*Id.* at p. 658, fns. omitted.)

Applying these factors to this case, defendant is not entitled to relief even if we assume his federal speedy trial protection attached in November 1991. Some of the delay was fully justified. Defendant was in hiding for some of the time. The trial court also found that he was "unavailable for prosecution in California after his arrest in Arizona until prosecution there was completed in May 1991."

Another part of the delay was at least understandable, even if we assume, without deciding, that it was not fully justified under high court precedent. Because defendant was sentenced to prison for life in Arizona, the district attorney originally made the practical decision that it was not worthwhile expending the necessary resources to extradite him to, and prosecute him in, California. But after defendant escaped from prison in Arizona and committed numerous other horrific crimes, ending with his rearrest in July 1992—which both showed that he remained a danger to society and made this a much stronger capital case—the district attorney reasonably decided it was then appropriate to prosecute him. We think this delay is at least a "more neutral reason" that "should be weighed less heavily" in the balancing process. (*Barker v. Wingo*, *supra*, 407 U.S. at p. 531.)

The reasons for the additional delay between defendant's rearrest in Arizona in July 1992 and the formal bringing of charges in May 1993 are unclear. Presumably, defendant was prosecuted in Arizona for his new crimes, which may explain some of the delay. In any event, the delay after July 1992 was considerably shorter than the one-year period the high court has identified as triggering inquiry into the *Barker* factors. Even if we were to find the

delay after the district attorney originally decided not to extradite defendant not fully justified, neither was it totally inexcusable. And even if we include the time from November 1991 (or even May 1991 when it appears California could first have demanded his extradition) until his escape in May 1992 to the period of unjustified delay, the total delay is still not considerably greater than the minimum necessary to trigger the *Barker* inquiry.

In examining the *Barker* factors, we find that the delay, even viewed in its worst light, was not extraordinarily long. Defendant's actions contributing to the delay—going into hiding, committing crimes in Arizona that caused authorities in that state to prosecute him after his arrest, escaping from custody and being at large again, then committing numerous new crimes in Arizona—are far more blameworthy than any government-caused delay. Defendant does not claim he asserted his right to a speedy trial. But the record is unclear whether he had formal notice of the charges before May 1993 or any real way to demand he be prosecuted in California. So this factor carries little weight either way. (See *Doggett*, *supra*, 505 U.S. at pp. 653–654.) Regarding prejudice, defendant was either at large or incarcerated in Arizona for crimes committed there during the period of delay. Accordingly, he cannot complain of oppressive pretrial incarceration. (*People v. Roybal*, *supra*, 19 Cal.4th at p. 513.) Defendant suggests he was prejudiced by his inability to gain concurrent sentencing. Because he faced four consecutive life sentences in Arizona and received the death penalty here, this was not significant prejudice. Defendant does not show that he suffered great anxiety and concern. If, as we do, we discount the significance of his failure to assert his right to a speedy trial, so too must we discount the possibility of anxiety and concern. (*Doggett*, *supra*, 505 U.S. at p. 654.)

This brings us to possible prejudice to defendant's ability to defend against the charge, the most serious of the types of prejudice that delay can cause. (*Doggett*, *supra*, 505 U.S. at p. 654.) As explained, under the federal Constitution, if the delay is extraordinary, prejudice is presumed. But such presumptive prejudice does not alone entitle a defendant to relief; it is only "part of the mix of relevant facts, and its importance increases with the length of delay." (*Id.* at p. 656.) The delay here pales in comparison to the government-induced delay in *Doggett*. It was not so egregious as to entitle defendant to relief solely due to presumptive prejudice. (*People v. Roybal*, *supra*, 19 Cal.4th at p. 513.) Defendant has also failed to show any particularized prejudice. In the trial court, he asserted the delay prejudiced him because he was unable to locate certain alleged witnesses. But, as the trial court noted in finding no prejudice, he failed to show that any of these persons were relevant to the case or could help him in any way. Accordingly, we find no violation of defendant's federal constitutional speedy trial rights.

The United States Supreme Court has also indicated that delay in bringing charges might violate a defendant's federal *due process* rights "if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to [his] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." (*United States v. Marion*, *supra*, 404 U.S. at p. 324; see *People v. Martinez*, *supra*, 22 Cal.4th at p. 765.) Defendant has not shown that the delay was intended to gain a tactical advantage. As explained above, he has also failed to show prejudice. Accordingly, we also see no violation of defendant's federal due process rights.

Defendant also claims the delay violated his state constitutional rights. "Under the *state* Constitution, the filing of a felony complaint is sufficient to trigger the protection of the speedy trial right." (*People v. Martinez*, *supra*, 22 Cal.4th at p. 754.) Accordingly, defendant's state constitutional speedy trial rights attached as of the filing of the complaint on December 4, 1990. However, "when a defendant seeks dismissal based on delay after the filing of the complaint and before indictment or holding to answer on felony charges, a court must weigh 'the prejudicial effect of the delay on defendant against any justification for the delay.' [Citations.] No presumption of prejudice arises from delay after the filing of the complaint and before arrest or formal accusation by indictment or information [citation]; rather, the defendant seeking dismissal must affirmatively demonstrate prejudice [citation]." (*Id.* at pp. 766–767.) As discussed above, defendant has shown no prejudice. Moreover, much of the delay, at least, was justified, especially the time when defendant was in hiding. Accordingly, we see no violation of defendant's state constitutional speedy trial rights.

Defendant also argues that at least the special circumstance allegations, which were first added in May 1993, should have been dismissed. He asserts that if he had been brought to California earlier to answer the charges he could have pleaded guilty to murder without special circumstances. But a complaint or even information can generally be amended to add special circumstance charges. (*People v. Edwards* (1991) 54 Cal.3d 787, 827 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *Talamantez v. Superior Court* (1981) 122 Cal.App.3d 629, 634–635 [176 Cal.Rptr. 800].) The district attorney added the special circumstance charges before defendant was first arraigned and could easily have done the same if he had prosecuted defendant earlier. We see no basis to assume that the district attorney would not have added the special circumstance allegations before the actual prosecution, whenever it might have begun. We find no more reason to dismiss the special circumstance allegations due to delay in the prosecution than to dismiss the other charges.

B. *Guilt Phase Issues*

1. *Court's Refusal to Excuse Two Prospective Jurors for Cause*

Defendant contends the trial court erred in denying his challenges for cause against two prospective jurors because, he argues, they favored the death penalty and were biased against him. The issue is not cognizable on appeal. "To preserve a claim based on the trial court's overruling a defense challenge for cause, a defendant must show (1) he used an available peremptory challenge to remove the juror in question; (2) he exhausted all of his peremptory challenges or can justify the failure to do so; and (3) he expressed dissatisfaction with the jury ultimately selected." (*People v. Maury* (2003) 30 Cal.4th 342, 379 [133 Cal.Rptr.2d 561, 68 P.3d 1]; see also *People v. Bittaker* (1989) 48 Cal.3d 1046, 1087 [259 Cal.Rptr. 630, 774 P.2d 659].) Here, defendant challenged both prospective jurors peremptorily and exhausted his peremptory challenges. But he never expressed dissatisfaction with the jury ultimately selected. Defendant claims he was, in fact, dissatisfied with the jury and would have challenged other jurors had he been able to do so. He also claims it would have been futile to ask the trial court for additional peremptory challenges. But defendant did not express any of this at trial on the record. A defendant must affirmatively *demonstrate* that the denial of his challenges for cause affected his right to a fair and impartial jury. (*People v. Maury*, *supra*, at p. 380; see also *People v. Bittaker*, *supra*, at p. 1087.) This he cannot do.

Moreover, we see no error. "[T]he qualification of jurors challenged for cause [is a] matter[] within the wide discretion of the trial court, seldom disturbed on appeal. [Citation.] To find actual bias on the part of an individual juror, the court must find 'the existence of a state of mind' with reference to the case or the parties that would prevent the prospective juror 'from acting with entire impartiality and without prejudice to the substantial rights of either party.' " (*Odle v. Superior Court* (1982) 32 Cal.3d 932, 944 [187 Cal.Rptr. 455, 654 P.2d 225], quoting Pen. Code, former § 1073, now Code Civ. Proc., § 225, subd. (b)(1)(C).) "When . . . a juror gives conflicting testimony as to her capacity for impartiality, the determination of the trial court on substantial evidence is binding on the appellate court." (*People v. Kaurish* (1990) 52 Cal.3d 648, 675 [276 Cal.Rptr. 788, 802 P.2d 278].) When a challenge is based on the prospective juror's views on the death penalty, the trial court must determine whether those views would prevent or substantially impair the performance of that person's duties. (*People v. Maury*, *supra*, 30 Cal.4th at p. 376.) The standard of review of the court's ruling regarding the prospective juror's views on the death penalty is essentially the same as the standard regarding other claims of bias. If the prospective juror's statements are conflicting or equivocal, the court's determination of the actual state of mind is binding. If the statements are

consistent, the court's ruling will be upheld if supported by substantial evidence. (*Id.* at pp. 376–377.)

Under this standard, we see no abuse of discretion. The first juror defendant complains about stated on her questionnaire that she believed life without the possibility of parole as an alternative to the death penalty "is a waste of money," and that she "strongly" agreed that, after a fair trial and guilt finding, the state should execute everyone who kills another human being. But at voir dire, after the court explained the law to her, she assured the court she would not select the death penalty just to save the state money, and that she would "do the best" she could in deciding the question of punishment fairly. Ultimately, when the court asked her whether she could make a choice between the death penalty and life without parole, she said, "That depends upon the case. I don't believe death is the only way, it just depends upon the circumstances and the case itself." She also stated on the questionnaire that if the defendant does not testify, he is probably guilty, and at voir dire she made some comments that the defendant would have the opportunity to prove his innocence. But she also explained that that had been her view at the time, and that she had "never been involved [in] anything like this." When the court explained to her the law regarding the burden of proof and told her she would have to find defendant not guilty if the prosecution had not met that burden, she said she understood and had no problem with it. On this record, we must defer to the court's ruling.

The second juror defendant complains about stated on the questionnaire that one of the most important problems in the criminal justice system is "not enforcing the death penalty." At voir dire, she also indicated a belief that defendants, including the defendant in this case, are probably guilty "or they wouldn't be there." She also, however, assured the court that she could follow the law, specifically including the prosecution's burden of proof. At one point, she indicated that she would always impose the death penalty for an intentional killing. When she said that, the court initially stated it would grant defendant's challenge for cause, but it permitted the district attorney to question her further. When the district attorney further explained to her the law, she stated she could return a verdict of life if she believed it appropriate under the law. She said she did not consider herself "as being unfair," although she also said she would be "leaning" in the prosecution's direction. After considering this additional voir dire, the court denied the challenge for cause. This juror's statements were contradictory and equivocal, and she certainly said some things that would have supported granting the challenge for cause. But this is precisely where an appellate court must defer to the determination of the trial court, which was present and could observe her during the questioning. Her statements that she was fair, would follow the law, and would consider both possible punishments, support the court's ruling.

## 2. *Issues Regarding One of Defendant's Statements*

Over defendant's hearsay objection, the court admitted evidence of his statement to Deputy Mayoya that he would not contradict his brother Steven if Steven had said he had committed a 1988 robbery of McCullough. The prosecutor referred to this evidence in his opening statement. Defendant later moved for a mistrial, arguing that the prosecutor's reference to the statement was prejudicial. The court denied the motion. In his rebuttal argument to the jury, the prosecutor argued without objection that this statement suggested that defendant had, in fact, committed that crime.[4] Defendant contends the court erred in admitting the evidence and denying the mistrial motion, and that the prosecutor committed misconduct in his argument to the jury. We disagree.

Defendant argues that the statement does not come within the exception to the hearsay rule for statements against interest. (Evid. Code, § 1230.) We need not decide the question, for the statement clearly comes within another exception to the hearsay rule: statements of a party. The hearsay rule does not bar statements when offered against the declarant in an action in which the declarant is a party. (Evid. Code, § 1220.) "The evidence was of statements, defendant was the declarant, the statements were offered against him, and he was a party to the action. Accordingly, the hearsay rule does not make the statements inadmissible." (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1049 [90 Cal.Rptr.2d 607, 988 P.2d 531].)[5] It is not clear from the record whether the court admitted the evidence as a statement of a party or as a declaration against interest, but it does not matter. The ruling was correct on at least one legal theory. (See *People v. Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

---

[4] The prosecutor was responding to defense counsel's argument that defendant was not involved in the 1988 crime. The prosecutor said: "[A]nd let's talk about that [1988 crime] for a second, because Mr. Rovell [defense counsel], . . . said I don't know what that's got to do were [*sic*: obviously "with"] anything. *The victim identified Steven.* How you doing Steve? Looks a lot like his brother, doesn't he? But, you know, what did Danny say in his statement when he was confronted with Steven's statement that it wasn't him, it was Danny that did the 1988 [robbery]? And then we get into the words of art. Well, I'm not going to contradict him, but I'm not going to agree with him either. Put yourself in that position, folks. . . . [I]f a detective is talking to you about a murder case and telling you that he thinks you did it, are you going to play the silly games that Mr. Horning did? And jerk the officer around? Or are you going to get up and say it wasn't me, I didn't do it, he's wrong, he was the one that did the 1988 robbery, not me. Or are you going to say I'm not going to contradict him. Don't agree with him, but I'm not going to contradict him." (Italics added.)

[5] The exception to the hearsay rule for statements of a party is sometimes referred to as the exception for *admissions* of a party. However, Evidence Code section 1220 covers all *statements* of a party, whether or not they might otherwise be characterized as admissions. (See *People v. Carpenter*, *supra*, 21 Cal.4th at p. 1049; *People v. Castille* (2003) 108 Cal.App.4th 469, 479 & fn. 4 [133 Cal.Rptr.2d 489].)

Defendant also argues the prosecution did not establish the corpus delicti of the 1988 robbery, and the statement was inadmissible evidence of other crimes. However, he objected solely on hearsay grounds, so he may not raise other objections on appeal. (*People v. Carpenter*, *supra*, 21 Cal.4th at p. 1049.) Absent an objection at trial, which would have given the prosecutor the opportunity to argue the matter, it is hard to evaluate defendant's contention, but the statement appears relevant at least to show defendant's previous knowledge about McCullough and his home, which was relevant to defendant's guilt of the charged offense. Moreover, "It is not clear that the corpus delicti rule applies to other crimes evidence offered solely to prove facts such as motive, opportunity, intent, or identity, or for impeachment." (*People v. Clark* (1992) 3 Cal.4th 41, 124 [10 Cal.Rptr.2d 554, 833 P.2d 561].) Assuming the rule does apply here, an objection on corpus delicti grounds would have permitted the prosecution to attempt to satisfy any evidentiary gap. In any event, evidence was presented without objection—partly by defense counsel—that McCullough had told others that he had been the target of crimes, and had identified Steven Horning as having perpetrated a 1988 robbery, which would seem to satisfy the corpus delicti rule. (*People v. Towler* (1982) 31 Cal.3d 105, 115 [181 Cal.Rptr. 391, 641 P.2d 1253] [" 'slight or prima facie proof' " suffices to establish the corpus delicti].)

Because the court properly overruled defendant's objection to the evidence, it acted within its discretion in denying defendant's mistrial motion following the prosecutor's reference to it in his opening statement. (*People v. Hines* (1997) 15 Cal.4th 997, 1038 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

Defendant contends the prosecutor's argument to the jury was misleading and contrary to facts the prosecutor knew. The issue is not cognizable on appeal because defendant did not object to the argument at trial, and an objection could have cured any harm. (*People v. Riel* (2000) 22 Cal.4th 1153, 1212 [96 Cal.Rptr.2d 1, 998 P.2d 969].) Defendant claims that because the court admitted the statement over his objection, any objection "to the prosecutor's argument or to the (misleading) inference he sought to have the jury draw" would have been futile. We disagree. A hearsay objection is different from an objection that an argument is misleading or contrary to the known facts. Defendant was obligated to object at trial to preserve the point for appeal. (*Id.* at pp. 1212–1213.) This he failed to do.

Moreover, any objection would have lacked merit. The prosecutor merely argued the evidence and inferences to be drawn from it, as he was entitled to do. (*People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Defendant points out that McCullough had previously identified Steven Horning as the perpetrator. Therefore, he argues, the prosecutor "knew full

well" that defendant had not committed the crime. However, the prosecutor "knew" no such thing. The prosecutor was not present at the 1988 events. He knew—as did the jury—that evidence existed that McCullough had identified Steven Horning as the perpetrator. Indeed, he acknowledged this fact to the jury. But he did not *know* that McCullough was correct or that Steven was the sole perpetrator. (See *People v. Riel*, *supra*, 22 Cal.4th at pp. 1181–1182; *People v. Gordon* (1973) 10 Cal.3d 460, 472–474 [110 Cal.Rptr. 906, 516 P.2d 298].) This whole point was minor in the context of the case as a whole, but the prosecutor was entitled to argue his view of the evidence—and the significance of defendant's statement to Deputy Mayoya—just as defendant was entitled to argue his view of it.

3. *Admission of Ballistics Evidence*

Over defendant's objection, the court permitted Criminalist Michael Giusto to testify that he compared the bullets obtained in this case with the gun barrel found on defendant's parents' property, and that the testing showed both bullets could have been fired from the gun of which the barrel was a part but that, due to their condition, he could not say for sure and could not quantify the probabilities.[6] Defendant contends the court should have excluded the evidence as irrelevant and unduly prejudicial. We disagree.

The trial court has broad discretion both in determining the relevance of evidence and in assessing whether its prejudicial effect outweighs its probative value. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468].) We see no abuse of discretion. Obviously, if Giusto had been able to state positively that the fatal bullet either did or did not come from the gun barrel on the Horning property, the evidence would have had greater probative value. But sometimes scientific examination of evidence is inconclusive. (E.g., *People v. Burgener* (1986) 41 Cal.3d 505, 515 [224 Cal.Rptr. 112, 714 P.2d 1251].) That circumstance does not make it irrelevant. It was relevant for the jury to learn that the evidence was tested, and that similarities among the items showed that both bullets might have been fired from the barrel, but that it was impossible to say for sure. (*People v. Cooper* (1991) 53 Cal.3d 771, 813 [281 Cal.Rptr. 90, 809 P.2d 865] [relevant for the jury to learn that two cigarette butts found in the victims' car were tested scientifically even though the results were inconclusive].) Defendant objects that Giusto's testimony was merely speculation. It was not. It was based on a scientific examination of evidence and the results of that examination.

---

[6] Defendant also objected to evidence that one bullet had come from the body of a dog he had apparently shot. The court excluded that evidence as unduly prejudicial and permitted the prosecution to prove only that the bullet was found on the Horning property.

The evidence was also not unduly prejudicial. The jury could easily understand that similarities among the objects indicated the bullets *might* have been fired from that particular gun, but that, due to their condition, Giusto could not be certain. Defendant was permitted to cross-examine Giusto extensively on the point. Indeed, *excluding* the evidence might have been unfairly prejudicial to the prosecution. The jury would naturally wonder if anyone had tested the bullets and barrel. If told nothing on the question, some jurors might have assumed no one had bothered to test the evidence, to the prosecution's substantial—and unfair—detriment. It would have been truly odd, and would only have puzzled the jury, to tell it that testing had been done, but withhold the results.

4. *Sufficiency of the Evidence*

Defendant contends the evidence was insufficient to support the jury's finding that he killed McCullough and committed murder in the first degree, and its finding true the two special circumstance allegations and the allegation that he personally used a firearm. In determining the sufficiency of the evidence, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) The same standard of review applies when the evidence of guilt is circumstantial and to special circumstance allegations. (*People v. Valdez* (2004) 32 Cal.4th 73, 104–105 [8 Cal.Rptr.3d 271, 82 P.3d 296].) We find the evidence sufficient to support all parts of the jury verdict.

The evidence that defendant was the killer was ample. Defendant's thumbprints and fingerprints appeared on two car ownership documents found in the victim's car shortly after the killing. When arrested in Arizona, defendant possessed the victim's gun, which had been seen in the victim's house as recently as a day or so before the killing. Parts of a .22-caliber rifle that could have been the murder weapon and a .22-caliber bullet that could have been fired from the murder weapon were found on the Horning property. Shortly before the killing, defendant's father saw him firing a .22-caliber rifle. Evidence showed that defendant had worn shorts and a tank top similar to shorts found with the body parts and a tank top found inside the victim's house. Other evidence showed that twice during the summer before the killing, defendant had been driven to a spot near the victim's house. Defendant was familiar with the area where the body parts were found, and with dismembering animals the way the body was dismembered. Very close to the time of the killing, defendant abruptly left California without saying

anything to his parents or sister even though, the day before the killing, he had arranged with his sister to fix her car a day or so after the killing. He then hid away in the mountains of Idaho as winter approached. He paid for groceries in Idaho with coins from a very heavy bag, an odd thing for a hiker to do. A large collection of coins was missing from the victim's house. The jury could reasonably infer that defendant lied in a number of respects to Detective Mayoya, including how he obtained the victim's gun and his denials of possessing or touching a .22-caliber gun and having been to the victim's house. A former fellow inmate testified that defendant had made statements indicating that he had killed a drug dealer in California.

Defendant stresses that the ballistics evidence connecting the fatal bullet with the rifle parts and bullet found on the Horning property was inconclusive. He is correct, but the circumstance that one piece of evidence was itself inconclusive does not negate the rest of the evidence that shows that defendant was the killer.[7]

The evidence also supported the first degree murder verdict. The court instructed the jury both on premeditated and deliberated first degree murder and on first degree felony murder. The evidence supported both theories. "Evidence concerning motive, planning, and the manner of killing [is] pertinent to the determination of premeditation and deliberation, but these factors are not exclusive nor are they invariably determinative." (*People v. Silva* (2001) 25 Cal.4th 345, 368 [106 Cal.Rptr.2d 93, 21 P.3d 769].) The evidence showed that defendant tied the victim's hands with duct tape and blindfolded him before shooting him in the head a single time from within two inches. A jury could reasonably infer a motive—the desire to prevent anybody from identifying him. The evidence also shows planning. Defendant points out that the tape and bags in which the body parts were placed were apparently obtained from the victim's house and argues that this shows the killing was not preplanned. But premeditation can occur in a short time. (*People v. Hughes* (2002) 27 Cal.4th 287, 371 [116 Cal.Rptr.2d 401, 39 P.3d 432].) The jury could reasonably infer that defendant brought the murder weapon with him, which, together with the evidence that he bound and blindfolded the victim at the scene of the crime, shows planning activity. The manner of killing, a single bullet from close range into the brain of a bound and blindfolded—and hence, so the jury could reasonably infer, unresisting—victim, shows a calculated design to ensure death rather than an unconsidered

[7] Defendant did not testify at the guilt phase. But even if the jury had heard his penalty phase testimony, it reasonably could have found his claim that he chose to leave California at the precise time of the killing, and that he happened to break into the victim's car in Stockton, go through papers in the car, and steal the gun from the car, no more credible than defendant's original story to Deputy Mayoya that he had obtained the gun in Utah.

explosion of violence. (*People v. Alcala* (1984) 36 Cal.3d 604, 627 [205 Cal.Rptr. 775, 685 P.2d 1126].) All this is sufficient evidence of premeditation and deliberation.

The evidence also supported a finding of first degree felony murder. The jury could reasonably have found that defendant took at least the victim's gun and collection of coins from inside the house. Moreover, the evidence showed that the victim generally kept large sums of money in his house. Defendant had no job and needed money. This evidence suffices to permit a reasonable trier of fact to find that defendant entered the house with the intent to commit theft, i.e., that he committed burglary (§ 459), and that he killed the victim during the course of a robbery. Defendant correctly argues that robbery or burglary felony murder requires that the intent to steal be formed *before* the fatal blow is struck, i.e., that he had to have intended to steal before he fatally shot the victim. (*People v. Hayes* (1990) 52 Cal.3d 577, 629–630 [276 Cal.Rptr. 874, 802 P.2d 376].) He argues there was no evidence he had that intent at that time. However, "when one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery." (*People v. Turner* (1990) 50 Cal.3d 668, 688 [268 Cal.Rptr. 706, 789 P.2d 887]; accord, *People v. Hughes, supra*, 27 Cal.4th at p. 357.) Murders are commonly committed to obtain money or other property. (*Hughes, supra*, at p. 357.) Here, the jury could reasonably find defendant went to the house to steal and killed while doing so.

Defendant argues that the .22-caliber bullet casing at the murder scene was found just *outside* the house, suggesting he might have shot the victim outside before he first entered the house, i.e., before he actually committed the burglary. But for purposes of the felony-murder rule, it does not matter. "A murder is of the first degree if 'committed in the perpetration of, or attempt to perpetrate' any of certain enumerated felonies, one of which is burglary. (§ 189.) Under this provision, a killing is committed in the perpetration of an enumerated felony if the killing and the felony 'are parts of one continuous transaction.' " (*People v. Hayes, supra*, 52 Cal.3d at p. 631.) Accordingly, "defendant was guilty of murder in the perpetration of burglary . . . if (1) defendant intended to commit the burglary when he killed [the victim], and (2) the killing and the burglary of [the victim's house] were part of one continuous transaction." (*Id.* at p. 632.) Thus, even if the jury found defendant had approached the victim's house with intent to commit burglary but killed the victim outside before consummating that burglary, it could still find him guilty of burglary felony murder. Defendant also argues that the victim might have invited him into the house. If so, that also makes no difference. "One who enters a room or building with the intent to commit a felony is guilty of burglary even though permission to enter has been extended to him personally or as a member of the public." (*People v.*

*Sears* (1965) 62 Cal.2d 737, 746 [44 Cal.Rptr. 330, 401 P.2d 938].) A rational trier of fact could have found all the elements of felony murder.

Defendant also argues the evidence was insufficient to support the burglary-murder and robbery-murder special-circumstance findings. To some extent, this argument duplicates his arguments regarding the first degree felony-murder rule. (See *People v. Hayes*, *supra*, 52 Cal.3d at pp. 631–632.) Additionally, for the felony-murder special circumstance to apply, the felony "must not have been merely incidental to the killing." (*People v. Valdez*, *supra*, 32 Cal.4th at p. 105.) As in *Valdez*, "defendant argues there was insufficient evidence establishing that he killed the victim in order to advance the independent felonious purpose of robbery." (*Ibid.*) He points out that, while correcting the record, the Attorney General argued that he and Steven Horning had "killed the victim in retaliation for the victim identifying the brother as the perpetrator of a burglary and robbery." However, even if we were to assume retaliation was one motive to kill (elsewhere in his brief defendant also argues that no evidence exists that he "had any preexisting motive" to kill), the evidence supporting a first degree felony-murder verdict identified above suffices to permit a reasonable trier of fact to find that the intent to steal was defendant's primary—or at least concurrent—motivation, and that he killed to facilitate the stealing. (*People v. Valdez*, *supra*, at pp. 105–106; *People v. Bolden* (2002) 29 Cal.4th 515, 557–558 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

Defendant also argues the evidence was insufficient to support the personal-gun-use finding. In addition to arguing the evidence was insufficient to permit the jury to find he was the killer, he also suggests that he might have aided and abetted someone else who actually used the firearm. He notes that Detective Mayoya testified (on cross-examination) that he believed more than one person was involved in the crime. (Indeed, Steven Horning was originally charged in this case, but the case as to him was dismissed.) But Detective Mayoya's belief was not *evidence* that someone else was involved. No such evidence was presented in this trial. Moreover, defendant was seen firing what the jury could have reasonably found to have been the murder weapon shortly before the killing. He possessed a gun taken in the crime when arrested months later. Defendant's fellow inmate testified that defendant made statements that the jury could reasonably infer indicated he had killed the victim. Under all the circumstances, a rational trier of fact could find defendant personally used a handgun during the commission of the murder.

### 5. *Failure to Instruct on Second Degree Murder*

Defendant contends the court erred in not instructing the jury on the lesser included offense of second degree murder. A court must generally

instruct the jury on lesser included offenses whenever the evidence warrants the instructions, whether or not the parties want it to do so. (See *People v. Barton* (1995) 12 Cal.4th 186, 196–198 [47 Cal.Rptr.2d 569, 906 P.2d 531].) We need not decide whether the evidence warranted an instruction on second degree murder in this case because we find any error both invited and harmless.

When the parties reviewed the instructions to be given, defense counsel stated he did not want the court to instruct on second degree murder. Later, after discussing the question with defendant, defense counsel reiterated that he did not want instructions on lesser included offenses. The court explained to defendant personally that he was entitled to have the court instruct the jury on second degree murder and manslaughter. Defendant personally stated that, on advice of counsel, he did not want those instructions. Accordingly, the court instructed the jury on first degree premeditated and felony murder and on the robbery-murder and burglary-murder special circumstances, but not on second degree murder or manslaughter. Originally, the court also instructed the jury that if it had a doubt about the degree of the murder, it must find the defendant guilty of second degree murder. During deliberations, the jury asked whether it was supposed to "make any decisions regarding degree." After discussing the question, and with the concurrence of both parties, the court told the jury that the original reference to second degree murder had been inadvertent and the jury should disregard it. Defense counsel also said that defendant had "asked that I state for the record" that defendant opposed an instruction on second degree murder. The court explained to defendant that if evidence had supported a second degree murder finding, it would be obligated to give that instruction, but it understood "that your defense in this matter is that you did not do it. And if that's your defense and that's what you feel the evidence does show, then I'm not obligated to give that instruction." Defendant stated personally that he understood and accepted what the court said.

"[A] defendant may not invoke a trial court's failure to instruct on a lesser included offense as a basis on which to reverse a conviction when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence. [Citations.] In that situation, the doctrine of invited error bars the defendant from challenging on appeal the trial court's failure to give the instruction." (*People v. Barton*, *supra*, 12 Cal.4th at p. 198.) The record here shows that defendant's "lack of objection to the proposed instruction was more than mere unconsidered acquiescence." (*People v. Avalos* (1984) 37 Cal.3d 216, 229 [207 Cal.Rptr. 549, 689 P.2d 121].) Rather, defendant did not want the instructions because they were inconsistent with his defense that he did not commit the crime at all. (*People v. Hardy* (1992) 2 Cal.4th 86, 184 [5 Cal.Rptr.2d 796, 825 P.2d 781].) Indeed, although it was not required, the court obtained defendant's

personal agreement that he did not want the instructions. (See *People v. Cooper*, *supra*, 53 Cal.3d at pp. 827–828.) Accordingly, he cannot complain on appeal of the court's failure to give the instruction.

Citing *Beck v. Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382], defendant argues the federal Constitution requires instruction on lesser included offenses in capital cases. However, "*Beck* does not prohibit a criminal defendant from choosing to forgo such instructions for strategic reasons, as was the case here." (*People v. Hardy*, *supra*, 2 Cal.4th at p. 185.) Moreover, "*Beck*'s principles were satisfied if the jury was provided some noncapital third option between the capital charge and acquittal. Here the jury was provided with the noncapital option of first degree murder without special circumstances." (*People v. Sakarias* (2000) 22 Cal.4th 596, 621, fn. 3 [94 Cal.Rptr.2d 17, 995 P.2d 152].)

Any error was also harmless. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646 [106 Cal.Rptr.2d 629, 22 P.3d 392].) Here, the jury was instructed on both premeditated first degree murder and first degree felony murder, as well as on both the burglary-murder and robbery-murder special circumstances. In addition to finding defendant guilty of first degree murder, the jury found both special circumstances true. If the jury had had any doubt that this was a felony murder, it did not have to acquit but could have simply convicted defendant of first degree murder without special circumstances. Instead, it found that defendant killed the victim in the perpetration of robbery and burglary, which means it necessarily found the killing was first degree felony murder. (*Ibid.*; *People v. Price* (1991) 1 Cal.4th 324, 464 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

Defendant notes that the jury asked several questions during deliberations, including whether it had to make any decision regarding degree, and argues this circumstance "reflected the jury's doubt regarding the sufficiency of the evidence to support a first degree murder verdict and its consideration of a lesser included offense." Such questions cannot detract from the verdicts the jury ultimately rendered, which show that it found the killing to be felony murder. Moreover, the questions suggest that the jury was carefully considering whether defendant had committed the crime, but not that it doubted that the crime was first degree murder. The court's original (and inadvertent) instruction that the jury had to give the defendant the benefit of any doubt regarding the degree of the crime, together with the absence of any other instructions regarding degree, naturally caused it to wonder if it was to make any finding in this regard. It so asked. The question showed that the jury had

doubt about what exactly it was supposed to do, not that it doubted that the killing was first degree felony murder.

6. *Other Instructional Issues*

Defendant contends the court committed several other instructional errors.

(a) In *People v. Green*, *supra*, 27 Cal.3d 1, the defendant had taken the murder victim's clothing at gunpoint in order to attempt to conceal the murder. We held that, although the taking constituted a technical robbery, the robbery-murder special circumstance was not established because the crime was not a murder in the commission of robbery, but a robbery in the commission of murder. (See *People v. Kimble* (1988) 44 Cal.3d 480, 500 [244 Cal.Rptr. 148, 749 P.2d 803].) We said that the felony-based special circumstances reflected a legislative belief that it was appropriate to make those who killed "to advance an independent felonious purpose" death eligible, but that this goal was not achieved when the felony was "merely incidental to the murder . . . ." (*Green*, *supra*, at p. 61.) As we have summarized the rule, "to prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder." (*People v. Mendoza* (2000) 24 Cal.4th 130, 182 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

The standard jury instructions were modified to reflect this holding. Today, as at the time of trial, CALJIC No. 8.81.17, paragraph 2, explains that, for a felony-based special circumstance to be found true, it must be proved: "The murder was committed in order to carry out or advance the commission of the crime . . . . In other words, the special circumstance referred to in these instructions is not established if the [crime] was merely incidental to the commission of the murder." At trial, for reasons not clear from the record, the court gave the second, but not first, sentence of this paragraph. Thus, the court told the jury: "In other words, the special circumstance referred to in these instructions is not established if the robbery or burglary were merely incidental to the commission of the murder."

Defendant contends the court erred in not also telling the jury the murder had to be committed in order to carry out or advance the robbery or burglary. We disagree. As the transitional words in the instruction, "In other words," suggest, *Green* established one requirement, not two. The point we made in *People v. Green*, *supra*, 27 Cal.3d 1, is that if the felony was merely incidental to the murder—as the evidence showed it was in *Green*—no separate felony-based special circumstance exists. We have used various phrasings in explaining this requirement, two of which are included in

CALJIC No. 8.81.17, but we have never suggested that we had created two separate requirements, or that any precise language was required to explain the concept to the jury. There is nothing magical about the phrase "to carry out or advance" the felony. Indeed, we ourselves have stated the requirement without using that phrase. (See *People v. Mendoza*, *supra*, 24 Cal.4th at p. 182; *People v. Clark* (1990) 50 Cal.3d 583, 608 [268 Cal.Rptr. 399, 789 P.2d 127].) Several ways exist to explain the requirement.[8] Even if it might have been better to give the entire second paragraph of CALJIC No. 8.81.17, the court's explanation that the burglary or robbery must not be "merely incidental to the commission of the murder," adequately conveyed the requirement.

Moreover, we have held it is not error to fail to give *any* such instruction if the evidence does not warrant it. "The second paragraph of CALJIC No. 8.81.17 is appropriate where the evidence suggests the defendant may have intended to murder his victim without having an independent intent to commit the felony that forms the basis of the special circumstance allegation. In other words, if the felony is merely incidental to achieving the murder—the murder being the defendant's primary purpose—then the special circumstance is not present, but if the defendant has an 'independent felonious purpose' (such as burglary or robbery) and commits the murder to advance that independent purpose, the special circumstance is present." (*People v. Navarette* (2003) 30 Cal.4th 458, 505 [133 Cal.Rptr.2d 89, 66 P.3d 1182]; see also *People v. Kimble*, *supra*, 44 Cal.3d at pp. 501–503.) Defendant again suggests he might have killed in retaliation for McCullough's having identified his brother Steven as the perpetrator of a crime. But no evidence was presented to the jury that this was his sole motivation, "and defendant did nothing to develop this theory of the case at trial . . . . Under the circumstances of the case as presented to the jury, the second paragraph of CALJIC No. 8.81.17 was not required." (*Navarette, supra*, at p. 505.) And certainly, the first sentence of that paragraph was not required in addition to the second sentence, which the court did give.

(b) As the court explained to the jury, robbery requires a taking from a person or the person's "immediate presence." (§ 211.) Defendant argues the court had a sua sponte duty to define the term "immediate presence." We disagree. "In the absence of a specific request, a court is not required to instruct the jury with respect to words or phrases that are commonly

[8] The CALJIC instruction does not use the term, "independent purpose," which we have also sometimes employed in explaining this concept. (See *People v. Mendoza*, *supra*, 24 Cal.4th at p. 182; see also *People v. Green*, *supra*, 27 Cal.3d at p. 61 [employing the term, "independent felonious purpose"].) Compare also our description of the requirement in *People v. Bonin* (1989) 47 Cal.3d 808, 850 [254 Cal.Rptr. 298, 765 P.2d 460], which uses the language, "in order to advance an independent felonious purpose," but does not additionally use the not-incidental-to-the-murder language.

understood and not used in a technical or legal sense. [Citation.] We think the phrase 'immediate presence' was sufficiently clear in the context of this case that no further clarification of the phrase was necessary." (*People v. Navarette*, *supra*, 30 Cal.4th at p. 503.) "If defendant thought the point needed additional clarification or explanation, defendant should have 'requested appropriate clarifying or amplifying language' [citation]; absent such a request, the point is not preserved for appellate review." (*People v. Bolden*, *supra*, 29 Cal.4th at p. 557.)

(c) Pointing out that prosecution witness Jan Biaruta was an in-custody informant, defendant next argues the court erred in failing to instruct the jury with CALJIC No. 3.20, which tells the jury to view such testimony "with caution and close scrutiny."[9] However, the instruction need be given only "upon the request of a party." (§ 1127a; see *People v. Turner* (1994) 8 Cal.4th 137, 201–202 [32 Cal.Rptr.2d 762, 878 P.2d 521].) Neither party requested the instruction in this case, so the court had no duty to give it. Moreover, it is far from clear whether the instruction would have helped or harmed defendant. Although it tells the jury to view the testimony with caution and close scrutiny, it also specifically directs the jury's attention to the extent to which the witness might have received or expected any benefits from the party calling him, in this case, the prosecution. Other than a trip to California to testify—where he remained in custody—no evidence was presented of any benefits the witness received or expected from the prosecution. Defendant reasonably might not have wanted to focus the jury's attention on the absence of any evidence of real or expected benefits.

(d) Defendant next argues that his statement to Deputy Mayoya that he would not contradict his brother Steven if Steven had said he had committed the 1988 robbery of McCullough was evidence of another crime, and the court erred in not instructing the jury, sua sponte, on the limited purpose for which it could consider the evidence. However, the court has no sua sponte duty to give such a limiting instruction. (§ 355; *People v. Collie* (1981) 30 Cal.3d 43, 63–64 [177 Cal.Rptr. 458, 634 P.2d 534].) Contrary to defendant's argument, "[t]his was not an 'extraordinary case' in which the unprotested evidence was '*both* highly prejudicial *and* minimally relevant to any legitimate purpose,' *and* was 'a dominant part of the evidence against the accused.' " (*People v. Farnam* (2002) 28 Cal.4th 107, 163–164 [121 Cal.Rptr.2d 106, 47 P.3d 988].) Moreover, defendant might well *not* have wanted the court to give his statement the emphasis a limiting instruction

[9] CALJIC No. 3.20, drawn from section 1127a, states: "The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating this testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This does not mean that you may arbitrarily disregard this testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in this case."

would have provided. (*People v. Freeman* (1994) 8 Cal.4th 450, 495 [34 Cal.Rptr.2d 558, 882 P.2d 249].)

(e) Defendant contends that the standard instructions on circumstantial evidence, which use the phrase "appears to you to be reasonable," "undermined the constitutional requirement of proof beyond a reasonable doubt." We have repeatedly rejected the argument and continue to do so. (*People v. Maury*, *supra*, 30 Cal.4th at p. 428.)

(f) Defendant contends that giving former CALJIC No. 2.90, with its use of the terms "moral certainty" and "moral evidence," improperly diluted the requirement of proof beyond a reasonable doubt. We have also repeatedly rejected the argument and continue to do so. (*People v. Maury*, *supra*, 30 Cal.4th at p. 429.)

(g) CALJIC No. 2.20 tells the jury it is the sole judge of the credibility of a witness and lists certain factors the jury may consider in determining credibility, one of which is a witness's felony conviction. CALJIC No. 2.23 tells the jury it may consider a felony conviction only to determine credibility, and such a conviction does not necessarily destroy or impair credibility but is a circumstance the jury may consider. The court deleted from CALJIC No. 2.20 the reference to a felony conviction and did not give CALJIC No. 2.23. Defendant contends the court erred because prosecution witness Jan Biaruta had a felony conviction.

When the parties discussed the instructions, the question arose whether any witness had suffered a felony conviction. The parties believed that, with one possible exception not relevant here, none had such a conviction. Thus, they agreed that, subject to confirming whether the one witness had a felony conviction (it was never so confirmed), the court would delete the reference to a felony conviction and would not give CALJIC No. 2.23. Later, after the court had finished instructing the jury, one of defendant's attorneys stated that "although we did withdraw that instruction on conviction of a felony," he had recently thought about it, and "Mr. Biaruta did testify and he was convicted of a felony." The court did not want to add that instruction at that time as it would have highlighted it.

We have said that the court should give the substance of CALJIC No. 2.20 in every criminal case, although it may omit factors that are inapplicable under the evidence. (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 883–884 [123 Cal.Rptr. 119, 538 P.2d 247].) Here, the court, with the concurrence of the parties, mistakenly believed no witness had suffered a felony conviction and, accordingly, failed to mention it or give CALJIC No. 2.23. Defendant argues that because of this, "the jury evaluated Biaruta's damning testimony

as if it had come from a thoroughly credible witness, without consideration of his felony conviction for burglary as a factor negatively affecting his credibility."

We need not decide whether the court erred, or whether defendant invited any error, for the failure to give these instructions was harmless under any standard. Except to the extent that it duplicated CALJIC No. 2.20, CALJIC No. 2.23 contained nothing favorable to the defense. Telling the jury it could consider Biaruta's felony conviction *only* on credibility, and that such a conviction did not necessarily destroy or impair credibility, would not help the defense. Defendants usually want such a limiting instruction when they themselves had testified and been impeached with a felony conviction, not when a *prosecution* witness had the conviction. (See, e.g., *People v. Lomeli* (1993) 19 Cal.App.4th 649, 654–655 [24 Cal.Rptr.2d 5], disapproved in *People v. Hernandez* (2004) 33 Cal.4th 1040, 1052, fn. 3 [16 Cal.Rptr.3d 880, 94 P.3d 1080]; *People v. Kendrick* (1989) 211 Cal.App.3d 1273 [260 Cal.Rptr. 27].) The failure to give CALJIC No. 2.23 did not prejudice defendant.

In the abstract, it might have benefited defendant for the court to include a felony conviction among the specific factors listed in CALJIC No. 2.20, but it was unnecessary to do so here. Biaruta testified on direct examination that he had a burglary conviction for which he was serving a 12-year prison sentence. On cross-examination, defense counsel elicited that he also had convictions for resisting arrest and criminal trespass. The court did give most of CALJIC No. 2.20, including that, "In determining the believability of a witness, you may consider *anything* that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness including *but not limited to* any of the following . . . ." (Italics added.) Accordingly, the jury was permitted to consider the felony conviction (and the witness's other convictions) on credibility. Defense counsel thoroughly cross-examined Biaruta and challenged his credibility. He argued that the jury should not "believe the word of a convicted felon who was in the Arizona prison." The prosecutor cited Biaruta's testimony only briefly in his opening argument, and even he stated that Biaruta was "certainly no prize in his own right." The record thus refutes defendant's claim that the jury evaluated Biaruta's testimony as if it had come from a thoroughly credible witness and without considering his felony conviction.

### C. *Penalty Phase Issue*

Defendant waived a penalty phase jury trial. After a contested penalty trial before the court, the court rendered a verdict of death and gave a detailed statement of reasons for its verdict. Thereafter, the court heard and denied defendant's motion for a new trial, again with a statement of reasons. Before

sentencing, the court permitted defendant personally to argue again for a life sentence. When defendant finished speaking, the question arose whether the court should entertain a motion to modify the sentence. (See § 190.4, subd. (e).) Defense counsel said, "I'm told there's some modification or something else the Court is supposed to do prior to the time, although Your Honor outlined that on September the 7th [when it rendered its verdict]. You may just want to refer to that." Counsel also said he did not "want to waive anything." In response, the court noted our decision in *People v. Diaz* (1992) 3 Cal.4th 495 [11 Cal.Rptr.2d 353, 834 P.2d 1171] and pointed out that it had already stated its reasons when it rendered its verdict. It said, "So I don't believe that's necessary at this point in time." Defense counsel responded, "Okay." After permitting counsel for both sides to argue again what the sentence should be, the court imposed the death sentence.

Defendant contends the court erred when it did not rule on an automatic motion to modify the sentence. Because defendant did not object, and the hearing occurred after our decision in *People v. Hill* (1992) 3 Cal.4th 959 [13 Cal.Rptr.2d 475, 839 P.2d 984], the issue is not cognizable on appeal. (*People v. Riel*, *supra*, 22 Cal.4th at p. 1220.) Counsel might not have wanted to "waive anything," but he did so when he suggested the court might just refer to its earlier ruling and responded, "Okay," after the court expressed the belief that it did not have to state its reasons again. Moreover, we see no error and no prejudice. A ruling on a modification motion would have been superfluous.

"We have never decided whether a defendant who waives a jury trial on the issue of penalty is entitled to a modification hearing under section 190.4, subdivision (e)." (*People v. Diaz*, *supra*, 3 Cal.4th at p. 575.) We noted in *Diaz* that the statutory language is ambiguous, sometimes referring to a verdict of death by the "trier of fact" and sometimes referring to the "jury's" findings. (*Id.* at p. 575, fn. 35, quoting § 190.4, subd. (e).) We also noted that, "[a]lthough at first glance a modification motion after a penalty phase court trial appears to be an exercise in futility, there is one aspect of the modification motion that is significant even when the penalty issue has been determined by a court rather than a jury: the requirement in section 190.4, subdivision (e) that the trial court 'state on the record the reasons for his [or her] findings.' . . . The statutory requirement that the reasons be stated on the record enables us to review the propriety of the penalty determination made by the trial court sitting without a jury." (*People v. Diaz*, *supra*, at p. 575, fn. 35.) In this case, the court gave detailed statements when it originally rendered its verdict even though, as it recognized, it was not required to do so at that time. (See *People v. Diaz*, *supra*, at pp. 571–572.) All the court failed to do was to repeat those reasons. Nothing in section 190.4 suggests the court must state its reasons *twice*. Moreover, defendant could have challenged the court's verdict as part of his new trial motion, which the court did entertain.

D. *Constitutionality of California's Death Penalty Law and Other Contentions*

Defendant reiterates various arguments that we have already rejected. We see no reason to reconsider our previous decisions. The aggravating factors, including section 190.3, factor (a), are not unconstitutionally vague. The statute is not invalid for failing to specify which factors are mitigating and which are aggravating, to limit aggravation to the specified aggravating factors, or to define aggravation or mitigation. Use of the word "extreme" in section 190.3 does not impermissibly restrict the sentencer's consideration of mitigating factors. The statute need not require written findings, unanimity as to aggravating circumstances (even when trial is before a jury), or findings beyond a reasonable doubt (except for other crimes). The special circumstances, including the felony-based special circumstances, are not impermissibly broad. Prosecutorial discretion in deciding whether to seek the death penalty is constitutional. (*People v. Jones* (2003) 30 Cal.4th 1084, 1128–1129 [135 Cal.Rptr.2d 370, 70 P.3d 359]; *People v. Maury*, *supra*, 30 Cal.4th at pp. 439–440; *People v. Burgener* (2003) 29 Cal.4th 833, 884 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Gurule* (2002) 28 Cal.4th 557, 663 [123 Cal.Rptr.2d 345, 51 P.3d 224]; *People v. Farnum*, *supra*, 28 Cal.4th at pp. 191–192; *People v. Riel*, *supra*, 22 Cal.4th at pp. 1224–1225.)

Neither intercase proportionality nor disparate sentence review is required. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Defendant is entitled to *intracase* proportionality review. (*Ibid.*) "He does not specifically request such review, but it would not aid him. Given the nature of the current crime and his previous criminal conduct [as well as his crime spree after he murdered McCullough], defendant's sentence is not disproportionate to his personal culpability." (*Ibid.*)

E. *Cumulative Prejudice*

Defendant contends the cumulative effect of the alleged errors was prejudicial. We disagree. There was little, if any, error to accumulate. Defendant received a fair trial.

### III. Conclusion

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied January 26, 2005. George, C. J., did not participate therein.