Filed 5/15/13  P. v. Levin CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B234523 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA077861) |
| v. | |
| JOHN L. LEVIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Janice C. Croft, Judge.  Affirmed.

Donna L. Harris for Defendant and Appellant.

Kamala D. Harris Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Russell A. Lehman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## BACKGROUND

Defendant John Levin and Michelle Raymie Longoria (Michelle) were married in January 2007. Defendant was described as sharp witted, funny and intelligent. He was a natural leader and well regarded by his peers, one describing him as a "take charge kind of person," "a person that would lead the conversation almost always or had a lot to say about whatever you were talking about." Defendant "was always the life of the party in the sense that the conversation was around him. He told jokes. He was always talking about current events, some project he was working on, some language he was learning, some rescue he had been on with the search and rescue." He weighed between 145 and 155 pounds.

Defendant was an emergency medical technician and member of the Montrose search and rescue team, a volunteer reserve sheriff's deputy team that performs rescues in the Angeles National Forest. To get onto the team defendant had attended the reserve sheriff's academy for six months and participated in mountain rescue training for approximately one year thereafter. Defendant participated in additional rescue training approximately once per month, went out on rescue patrols approximately one weekend per month, and responded to emergency rescue calls as needed. One year, he received the rescue team's Golden Piton award for responding to the most emergency calls that year. As a team member and reserve sheriff's deputy, defendant had law enforcement powers, received weapons training, and was issued a badge and handgun. The pay was $1 per year.

Defendant had a 13-year-old son, A., and a 12-year-old daughter, E., from a prior marriage. He was active in the children's lives, attended E.'s softball games, and took A. geocaching. Michelle treated the children nicely and was like a big sister to E., playing with her and her Bratz dolls, sometimes doing their hair. The children lived with defendant and Michelle in their small apartment every other weekend and had dinner with them on Tuesdays and Thursdays. A. described defendant as a "neat freak."

2

Defendant and Michelle had a small dog named Rupert. Defendant loved the dog, played with him and, in the words of A., "had fun with him a lot."

Beginning in 2006, defendant's relatives and peers noticed John and Michelle often exhibited slurred speech, a stumbling gait, and other signs of impairment. Defendant became reclusive, had trouble articulating his thoughts, and was not as quick witted as he had been. By 2007, he was "very slow to talk, very slow to answer." He was "[b]arely understandable" and "could barely put three words in front of each other to communicate properly."

At two rescue team training sessions in 2007, defendant staggered when he walked, trembled, and slurred his speech. He was let go from the team in 2008.

When the children visited defendant's residence, defendant and Michele would stay in their bedroom, leaving A. and E. to entertain themselves. The kitchen reeked, there were piles of laundry, trash and dog feces on the floor, and the apartment smelled of urine, "disgusting," "like a cat's box urine."

A. described defendant as being "very skinny" and unhealthy looking. An uncle said he was gaunt and pale and had suffered, "[e]xtreme loss of weight, look[ing] very sickly" and malnourished, like "a cancer patient." "[H]is clothes just hung on him." Defendant's brother said "[h]is facial features were sunken. He didn't look healthy. Then his actions were . . . slow movements, thinking through his speech. He wasn't as quick witted as I always remembered him. He wasn't as responsive, but still he was functional but not his normal self." He weighed approximately 110 pounds.

At one of E.'s softball games, Michelle staggered when she walked and slurred her speech, and she and defendant seemed to E. to be "under the influence." Concerned parents called defendant's former wife to come pick up the children.

In 2009, defendant was involved in an automobile accident while driving the children to school. The children decided not to drive to school with him anymore.

Defendant's family staged a drug intervention for him and Michelle, but defendant told them they were overreacting and he was fine. He later told a relative he and Michelle were in Las Vegas to check into a drug rehabilitation program. They never did so.

Several days later, on the morning of September 9, 2009, defendant stabbed Michelle once in the back with a knife in their bedroom in Glendale. He then locked the bedroom door, put Rupert in a microwave oven and turned it on, locked up the apartment, and drove to Canada, leaving Michelle to bleed to death.

Michelle's and Rupert's bodies were found by police the next day. The apartment was in disarray, like it had been ransacked. Dog feces was all over the floors, a coffee table had numerous pill bottles on it, with pills spilled out onto the floor, and the nightstands in the bedroom were covered with empty bottles, drinking glasses, medication boxes, leftover food, and trash, including several cups full of cigarette butts. All the food had been taken out of the refrigerator and set on counters, and shelves from the refrigerator were spread out on the floor in front of it. Three knives taped together with masking tape were on the kitchen floor, along with a fourth knife. A fifth knife, this one bloody, was on a counter. Rupert's carcass was in the microwave, burned and bloodied, with blood spattered around the microwave interior.

There was a blood trail in the stairwell leading to the bedroom, where Michelle's body was discovered on the floor beside the bed.

Michelle died from a single stab wound to the back, three inches deep. Her blood toxicology screen showed a blood alcohol level of 0.10 percent and was positive for Carisoprodol, a muscle relaxant and anti-pain drug commonly marketed as "Soma," and butalbital, a barbiturate/sedative.

Eighteen prescription pill bottles in defendant's name for Carisprodol were found in defendant's cars and apartment. Each bottle was labeled to contain 180 pills, with directions to take one tablet three times per day. All but one of the bottles came from out of state, and all but one of the prescriptions was filled between May 3, 2009 and August 20, 2009.

4

Defendant was detained when he tried to drive across the Canadian border. He had cuts and scratches on his hands and wrists and a cut on his chest. Defendant first told police he had no idea why he had been arrested. He and Michelle had a healthy and loving relationship, but he left the apartment because she was taking Soma and "just went crazy." She stabbed him in the chest while he was asleep, then told him to "[G]et the hell out," and she would "see [him] in hell." He was "just trying to get a few days between" them so he "could get back together with her." There was nothing physically wrong with her when he left—she was standing at the door yelling and throwing knives at him.

Defendant next told police that he threw a knife at Michelle, which hit her in the back and penetrated about an inch. She told him she would see him in hell and collapsed on the bed. He panicked, grabbed his keys and pouch and two computers ("Because I thought I'd be working"), and got in the car and drove away. Although at first defendant said he did not remember going into the kitchen, he later said that after wounding Michelle he went to the kitchen, took everything out of the refrigerator, and shut himself in it for 30 minutes, hoping to die. When that did not work, he went back upstairs and saw Michelle bleeding. After she told him she would see him in hell, he gathered his things and left.

Defendant at first denied anything had happened to the dog but later stated he killed it in the microwave because it had eaten some of Michelle's medicine, "was freaking out," and tried to bite him.

Defendant said the knives in the kitchen were taped together because he wanted to sit on them to kill himself, but ultimately did not do so. Defendant said he stabbed Michelle because she asked him to, he knew she was dying, and he stabbed himself in the chest because he needed a "defense strategy," something to make it look like he was running away from something.

Defendant said he and Michelle were both "on drugs," and he had last used Soma on Friday, September 11, 2009. But when asked whether the drugs had some effect on what he had done, he answered, "No." He took Soma for jaw pain, and although he abused it in the past, he had not abused it recently.

Defendant was charged with one count of murder (Pen. Code, § 187, subd. (a))[1] and one count of animal cruelty (§ 597, subd. (a)), and it was alleged he committed the murder with a deadly and dangerous weapon, a knife (§ 12022, subd. (b)(1)). He pleaded not guilty and denied the special allegation, later changing his plea to the animal cruelty count to no contest.

Although the prosecution urged the jury to find defendant guilty of first degree murder, it found him guilty only of second degree murder, finding true the allegation that the murder was committed with a knife. He was sentenced to 15 years to life in prison plus a consecutive one-year enhancement for use of a knife, plus a consecutive two-year term for animal cruelty. He timely appealed.

After appellate counsel submitted the matter in this court on the briefs, we reviewed the record and requested that the parties submit supplemental briefs on whether the trial court erred in refusing to instruct the jury with CALJIC Nos. 4.21 and 4.22, pertaining to intoxication, and, if so, whether the error was prejudicial. Defendant and respondent both submitted supplemental letter briefs that we have considered.

## DISCUSSION

### A. Jury Instructions Pertaining to Mental Impairment

Defendant requested an instruction in the terms of CALJIC No. 8.47, pertaining to unconsciousness due to voluntary intoxication. As requested, CALJIC No. 8.47 reads: "If you find that a defendant, while unconscious as a result of voluntary intoxication, killed another human being without an intent to kill and without malice aforethought, the crime is involuntary manslaughter. [¶] This law applies to persons who are not conscious of acting but who perform act [sic] or motions while in that mental state. The condition of being unconscious does not require an incapacity to move or to act. [¶] When a person voluntarily induces his own intoxication to the point of unconsciousness, he assumes the risk that while unconscious he will commit acts dangerous to human life or safety. Under those circumstances, the law implies criminal negligence."

---

[1] Undesignated statutory references are to the Penal Code.

The trial court refused defendant's request to give this instruction, finding no substantial evidence that defendant was intoxicated or unconscious when he stabbed Michelle.

Defendant contends lack of the voluntary intoxication instruction violated his constitutional right to present a defense. We disagree.

With respect to any defense or defense theory, the trial court must give a requested instruction only if substantial evidence supports the proffered defense or theory. (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) For example, a trial court must instruct sua sponte on a lesser included offense if there is substantial evidence that would, if accepted by the trier of fact, absolve the defendant of guilt of the greater offense but not of the lesser. (*People v. Blair* (2005) 36 Cal.4th 686, 745.) Substantial evidence in this context is "evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." (*Ibid.*) In deciding whether substantial evidence necessitates an instruction, the court determines only the legal sufficiency of the evidence, not its weight. (*People v. Flannel* (1979) 25 Cal.3d 668, 684, overruled on another ground in *In re Christian S.*, at p. 777.) "'Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused.' [Citations.]" (*People v. Flannel*, at p. 685.) The test is not whether there is any evidence, but whether there is evidence from which a reasonable jury could have found the specific facts supporting the instruction. (*Id.* at p. 684.)

"When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter." (*People v. Ochoa* (1998) 19 Cal.4th 353, 423.) Involuntary manslaughter is a lesser offense of murder. (*People v. Abilez* (2007) 41 Cal.4th 472, 515.)

The record includes no evidence that defendant was intoxicated to the point of unconsciousness when he killed Michelle. Although defendant told police he and Michelle were "on drugs," there was no evidence that Carisoprodol, a muscle relaxant and pain reliever, would have rendered him unconscious. Defendant himself told police

7

that drugs had no effect on what he had done. The trial judge thus properly declined to instruct the jury on involuntary manslaughter.

Defendant argues substantial evidence indicated he was a drug addict whose life had spiraled out of control. By 2009 he was hopelessly addicted to prescription drugs, he was intoxicated numerous times from 2006 to 2009, his personality, personal habits, and physical condition changed drastically for the worse, and he told police he and Michelle were both on drugs and the last time he used Soma was Friday, September 11, 2009, two days after the murder. Furthermore, although defendant was described as sharp and quick witted by several people, he did not have a believable, well-thought out explanation for how Michelle had been stabbed. He argues his mental impairment before the murder and his inability to formulate a coherent story afterward imply he suffered impairment continuously up to the time he was arrested, and the jury would have been entitled to conclude his rambling and bizarre account of events was made up by someone who did not remember exactly what had happened.

We disagree. Nothing in the record suggests defendant was so mentally impaired at any time as to be unconscious. That defendant held a job at all and was reasonably functional compels a contrary conclusion.

Even if failing to instruct on involuntary manslaughter was error, any error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836, which requires reversal only where a different verdict would have been probable absent the error. (See *People v. Breverman* (1998) 19 Cal.4th 142, 178 [failure to instruct sua sponte on a lesser included offense is reviewed for prejudice under *People v. Watson*].) Defendant was able to recount in detail his actions on the morning of the murder, actions that revealed he was "not only conscious, but calculating, alert and methodical." (*People v. Haley* (2004) 34 Cal.4th 283, 313.) For example, defendant described how immediately after the murder he formulated a plan to stab himself in the chest as part of a "defense strategy," gathered computers in anticipation of using them in his work, locked up the house and drove from Southern California to Canada. That defendant was able to describe the crime in detail, formulate a defense strategy, collect his things and drive to Canada shows that no

8

reasonable jury could have found him to be so incapacitated as to be guilty of involuntary manslaughter.

In supplemental briefing defendant argues the trial court prejudicially erred in refusing to instruct the jury with CALJIC Nos. 4.21 and 4.22, pertaining to voluntary intoxication, which would have permitted the jury to convict him only of involuntary manslaughter. We disagree. Assuming for purposes of argument that substantial evidence supported the giving of an instruction on voluntary intoxication, any error in refusing to give the instruction in this case was clearly harmless.

"A conviction for murder requires the commission of an act that causes death, done with the mental state of malice aforethought (malice). [Citation.] Malice may be either express or implied. [Citation.] . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses. . . . [¶] The law recognizes two degrees of murder. . . . A person who kills unlawfully with implied malice is guilty of second degree murder." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)

"[A] defendant who kills without express malice due to voluntary intoxication can still act with implied malice." (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1378.) In fact, evidence of involuntary intoxication is inadmissible to negate implied malice. (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1300 ["voluntary intoxication is irrelevant to proof of the mental state of implied malice"; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1114 [same]; cf. § 29.4, subd. (b) ["Evidence of voluntary intoxication is admissible solely on the issue of . . . whether the defendant premeditated, deliberated, or harbored express malice aforethought"].)

Here, whether defendant was intoxicated when he killed Michelle is irrelevant for our purposes because in finding him guilty of second degree murder, the jury necessarily concluded he harbored at least implied malice aforethought toward her. Voluntary intoxication does not negate implied malice aforethought, and an intoxication instruction

9

would not have enabled the jury to find defendant guilty of manslaughter instead of murder. Therefore, any error in failing to give the instruction was harmless.

**B.      Admission of Evidence Pertaining to Animal Cruelty**

Defendant contends the trial court erred when it admitted evidence that he killed Rupert even after he pleaded no contest to the animal cruelty charge. He argues the evidence was irrelevant and, even if relevant, inadmissible under Evidence Code section 352 because its probative value was substantially outweighed by its unduly prejudicial impact. We disagree.

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is that which tends in reason to establish material facts. (Evid. Code, § 210; *People v. Harris* (2005) 37 Cal.4th 310, 337.) Under Evidence Code Section 352, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352). "The trial court has broad discretion both in determining the relevance of evidence and in assessing whether its prejudicial effect outweighs its probative value." (*People v. Horning* (2004) 34 Cal.4th 871, 900.) A court abuses its discretion when its ruling "falls outside the bounds of reason." (*People v. De Santis* (1992) 2 Cal.4th 1198, 1226.)

Murder is the killing of a human being with malice aforethought. (§ 187.) First degree murder, with which defendant was charged, is any kind of willful, deliberate and premeditated killing. (§ 189.)

Glendale Police Detective Joshua Wofford testified that he found the burned and bloodied carcass of a small dog in the microwave in defendant's kitchen, and blood was spattered on the inside of the microwave. An audio recording of defendant's interview with police was played for the jury, including his statement that he killed the dog by putting it in the microwave. Over the prosecution's objection, photographs of the dog's body were excluded from the jury.

10

The evidence reasonably established that after stabbing Michelle, and while she was bleeding to death, defendant killed Rupert because the dog was "freaking out." The evidence was relevant because it tended in reason to establish either that defendant harbored malice toward Michelle that carried over to the dog or that he deliberately sought to avoid discovery by neighbors whom the dog might have alerted. Furthermore, the dog's fate and defendant's changing story concerning it demonstrated the lack of credibility of his initial denial of having killed Michelle and his mental capacity to conceal the crime.

There was no indication in the record that the evidence concerning Rupert would inflame the jury, as the prosecutor elicited only neutral and brief responses from Detective Wofford concerning his finding Rupert in the microwave, and defendant's killing of Rupert was no more heinous than his stabbing Michelle in the back and leaving her to bleed to death. In the end, although the prosecution urged the jury to find defendant guilty of first degree murder, it found him guilty only of second degree murder, which indicates the jury was not inflamed.

Moreover, any alleged error in admitting the evidence was harmless. (*People v. Watson*, *supra*, 46 Cal. 2d at p. 836.) To warrant reversal there must be a reasonable probability "a result more favorable to the appealing party would have been reached in the absence of the error." (*Ibid*.) A reasonable probability "does not mean more likely than not, but merely a *reasonable chance*, more than *abstract possibility*. [Citations.]" (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) Here, defendant admitted to police that he stabbed Michelle in the back, deliberately locked the bedroom door, collected his things, locked up the house and drove to Canada, knowing she was bleeding to death. All evidence supported the admission and none contradicted it. Therefore, no reasonable probability exists that the jury would have reached a different verdict had evidence concerning Rupert's death been omitted.

11

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

                                        CHANEY, J.

We concur:


MALLANO, P. J.


ROTHSCHILD, J.

12